**Phillip M. PROCTOR, et al., Appellants,**

v.

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, et al.**

**No. 80–2437.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 7, 1981.

Decided March 16, 1982.

Jerry S. Cohen, Washington, D. C., with whom Michael D. Hausfeld, Washington, D. C., was on the brief, for appellants.

Bruce L. Montgomery, Washington, D. C., with whom James F. Fitzpatrick, Melvin C. Garbow, David P. Towey, Washington, D. C., for State Farm Mutual, Alan H. Silberman, Chicago, Ill., for Allstate, Robert M. Osgood and Margaret K. Pfeiffer, New York City, for Travelers Indemnity were on the joint brief for appellees, State Farm Mutual Automobile Insurance Co., et al.

John P. Arness, Washington, D. C., with whom David B. Waller and David A. Kikel, Washington, D. C., were on the brief for appellee, Liberty Mutual Insurance Co.

Larry L. Williams and J. Griffin Lesher, Washington, D. C., were on the brief for appellee, Nationwide Mutual Insurance Co.

Before ROBINSON, Chief Judge, and WRIGHT and EDWARDS, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

Dissenting Opinion filed by Circuit Judge J. SKELLY WRIGHT.

## TABLE OF CONTENTS

|  | Page |
|---|---|
| I. HISTORY OF THE PROCEEDINGS IN THIS CASE | 312 |
| A. The First District Court Decision | 312 |
| B. The Court of Appeals Decision | 313 |
| C. The Supreme Court's Remand in Light of *Royal Drug* | 314 |
| D. The District Court Decision on Remand | 315 |
| II. ISSUES ON APPEAL | 316 |
| III. APPELLANTS' CLAIM OF A HORIZONTAL RESTRAINT OF TRADE | 318 |
| A. Whether the Alleged Horizontal Agreement Constitutes the "Business of Insurance" Under the McCarran Act | 318 |
| 1. The Interpretation of the "Business of Insurance" After *Royal Drug* | 318 |
| 2. Application of *Royal Drug* to the Facts of this Case | 321 |
| B. Inadequacy of Evidentiary Support for Appellants' Claim of a Horizontal Price-Fixing Agreement or Conspiracy | 325 |
| 1. Scope of Review by an Appellate Court | 325 |
| 2. Basic Antitrust Principles Governing Appellants' Claim | 327 |
| 3. The Record Evidence in this Case | 327 |
| (a) Evidence Cited in Appellants' Brief on Appeal | 328 |
| (b) Evidence Cited by Appellants in Opposition to the Renewed Motions for Summary Judgment Below | 330 |
| (c) Self-Serving Statements and Conclusionary Allegations in Appellants' Affidavits | 333 |
| 4. Summary of Evidence and Findings | 334 |
| IV. APPELLANTS' CLAIM OF VERTICAL RESTRAINTS OF TRADE | 335 |
| A. Whether the Alleged Vertical Arrangements Constitute the "Business of Insurance" Under the McCarran Act | 336 |
| B. The Legality of the Alleged Vertical Arrangements | 337 |
| V. CONCLUSION | 339 |

**HARRY T. EDWARDS, Circuit Judge:**

This case is before us for the second time on appeal from a grant of summary judgment by the District Court. Appellants, several automobile repair shops, brought this suit ten years ago alleging that appel-

lees, five automobile insurance companies,[1] had conspired to fix the price of automobile body damage repair work in violation of section 1 et seq. of the Sherman Anti-Trust Act, 15 U.S.C. § 1 et seq. (1976).[2] Appellants' theory of liability has changed somewhat over the course of this litigation. Essentially, they now claim that the insurance companies agreed to a common formula for reimbursing their insureds for the cost of automobile damage repair work. In particular, they allege a horizontal agreement among appellees to pay automobile damage claims on the basis of an agreed "prevailing" hourly labor rate, thereby artificially depressing the price of automobile repair work.[3] Appellants claim that appellees implemented this alleged horizontal agreement by entering into vertical arrangements with certain "preferred" or "captive" repair shops that agreed to perform repair work at the rates prescribed by appellees. When this suit was initiated a decade ago, appellants also claimed that appellees had engaged in a group "boycott" of "independent" repair shops; however, appellants abandoned their "boycott" claim during their last appearance before the District Court, and they have not pressed the argument on this appeal.

The District Court first granted summary judgment to appellees in 1975, on the ground that the challenged practices—both horizontal and vertical—were immunized from federal antitrust attack under the McCarran-Ferguson Act, 15 U.S.C. §§ 1011–1015 (1976) (hereinafter referred to as the "McCarran Act"). This judgment was premised on findings that the disputed practices constituted the "business of insurance" and were "regulated by State Law." *Id.* § 1012(b).[4] This court affirmed, but the Supreme Court subsequently vacated and remanded for further consideration in light of its decision in *Group Life & Health Insurance Co. v. Royal Drug Co.*, 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979), concerning the definition of the "business of insurance" under the McCarran Act. On remand, the District Court again granted summary judgment to appellees, holding that (1) *Royal Drug* did not alter the ruling of the Court of Appeals that the McCarran Act immunized the alleged horizontal agreement from antitrust scrutiny, (2) the McCarran Act probably also immunized the alleged vertical arrangements and (3) even if the Act did not provide immunity, the vertical arrangements did not violate the antitrust laws.[5]

Appellants attack the District Court's decision primarily on the ground that the McCarran Act antitrust exemption applies to neither the horizontal nor the vertical

1. Initially, appellants also named as defendants two damage claims adjusting companies that are no longer parties to the suit.

2. Section 1 of the Sherman Act provides in pertinent part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal...." 15 U.S.C. § 1 (1976).

3. Appellants have also alleged that appellees agreed on certain standardized estimates of the time necessary to complete repair work and on discounts for parts used in repair. Appellants' claim focuses, however, on the hourly labor rate, which they contend accounts "for approximately 50 percent of the total outlay for repair costs." Appellants' Brief at 6.

4. 15 U.S.C. § 1012(b) (1976) provides:
   (b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: *Provided,* That after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended [15 U.S.C. § 41 et seq.], shall be applicable to the business of insurance to the extent that such business is not regulated by State Law.

5. *Proctor v. State Farm Mutual Auto. Ins. Co.*, 406 F.Supp. 27 (D.D.C.1975), *aff'd*, 561 F.2d 262 (D.C.Cir.1977), *vacated and remanded for further consideration in light of Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979), 440 U.S. 942, 99 S.Ct. 1417, 59 L.Ed.2d 631 (1979) ("*Proctor I*"), *on remand*, [1980–81] Trade Cases (CCH) ¶ 63,591 (D.D.C.1980) ("*Proctor II*").

practices challenged in this case because they do not constitute the "business of insurance." Both sides argue on appeal that the Supreme Court's decision in *Royal Drug* clearly dictates a result in their favor on this issue. On the contrary, we have found it difficult to apply the Court's definition of the "business of insurance" in *Royal Drug* to the facts of this case. We are not alone in this struggle to interpret *Royal Drug*; courts and commentators have offered widely divergent views about the scope of the McCarran Act antitrust exemption following *Royal Drug*.[6]

After fully considering the Court's analysis in *Royal Drug*, we hold that, as to the horizontal claim, appellees are entitled to summary judgment because the alleged agreement between the insurance companies constitutes the "business of insurance" and, therefore, is exempt under the McCarran Act. In addition, we have carefully reviewed, and liberally construed, the documents and testimony in the record cited by appellants in support of their horizontal claim. We find that none of this evidence supports their allegations of a horizontal agreement or conspiracy among appellees to fix the price of automobile repair work. Thus, even if we assume, *arguendo*, that the McCarran Act exemption does not apply to the alleged horizontal agreement, we can find no merit to the antitrust claim on this portion of the case. Consequently, we hold, in the alternative, that appellees have demonstrated that there exists no genuine issue of fact material to appellants' horizontal claim and that they are entitled to judgment as a matter of law.

As to the alleged vertical arrangements, we hold that the District Court erred in concluding that these arrangements constitute the "business of insurance" under the McCarran Act. Nonetheless, we affirm the District Court's grant of summary judgment on this issue because we agree with

its conclusion, not disputed on appeal, that the vertical arrangements themselves do not violate the antitrust laws. Finally, because we find no evidentiary support for the alleged horizontal agreement, we reject appellants' claim that appellees *implemented* a horizontal scheme by entering into vertical agreements with preferred or captive repair shops. We offer no opinion, however, as to the legality of any such implementation if shown to exist in another case.

## I. HISTORY OF THE PROCEEDINGS IN THIS CASE

### A. The First District Court Decision

Appellants brought this suit against five insurance companies on February 9, 1972. On December 18, 1975, the District Court granted summary judgment in favor of the five insurance companies on the ground that their activities were exempt from the antitrust laws under the McCarran Act. To qualify for exemption under that Act, the challenged practices must (1) constitute the "business of insurance," (2) be "regulated by State Law," and (3) not involve any "boycott, coercion or intimidation." 15 U.S.C. §§ 1012(b), 1013(b) (1976).[7] The District Court found that the practices and procedures involved in adjusting and settling automobile damage claims, which were an integral part of the activities challenged by appellants, constituted the "business of insurance."

To conclude, the settlement and payment of damage repair claims is (1) a basic part of the contractual obligation owed by the insurance company to the insured, whether or not the payment is made to the insured or on his behalf, (2) directly affects the rate-making structure of the insurance company and the level of premiums to be charged, and (3) is connected directly with the writing of the policy, its interpretation and enforce-

---

6. *See* notes 20–24 *infra* and accompanying text.

7. 15 U.S.C. § 1013(b) (1976) provides:

    (b) Nothing contained in this chapter shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation.

    *See* note 4 *supra* for the text of 15 U.S.C. § 1012(b).

ment. The practices challenged here are *peculiar* to the business of insurance within the meaning of the McCarran Act. *Proctor v. State Farm Mutual Automobile Insurance Co.*, 406 F.Supp. 27, 30 (D.D.C. 1975). Broadly construing the McCarran Act requirement that the challenged business of insurance be "regulated by State Law," 15 U.S.C. § 1012(b),[8] the District Court also concluded that the state law in Virginia and Pennsylvania [9] regulated the automobile insurance business sufficiently to satisfy this requirement. 406 F.Supp. at 31. Finally, very narrowly construing the "boycott" exception in the McCarran Act, 15 U.S.C. § 1013(b),[10] the court held that appellants had produced inadequate evidentiary support for their allegations of "boycott, coercion and intimidation" by appellees, particularly "since [appellants'] services were utilized throughout the period of this suit by persons insured by [appellees]." 406 F.Supp. at 31–32.

## B. *The Court of Appeals Decision*

Appellants challenged the District Court's decision on the grounds that (1) the disputed insurance company practices did not constitute the "business of insurance" under the McCarran Act, and (2) they had raised material issues of fact concerning their boycott claim. On June 17, 1977, a panel of this court affirmed the District Court's decision. The court held that the alleged horizontal agreement was the "business of insurance" and was therefore protected under the McCarran Act. The court stated:

[W]e have little doubt that what appellants have characterized as the "core" of

their case, the alleged horizontal agreement to pay insureds' claims on the basis of the prevailing labor rate, as well as appellees' supposed adherence to a common formula to compute damage estimates, fits within the "core" of the "business of insurance." The essence of the automobile insurance contract is the insurance company's agreement, in return for a premium, to make payments to or on behalf of the policyholder for losses arising out of the ownership, maintenance, or use of an automobile. The determination by the insurance company of the amount to be paid in discharge of this contractual obligation is at the heart of the relationship between insurer and insured, and is directly connected with the reliability, interpretation, and enforcement of the insurance contract.

*Proctor v. State Farm Mutual Automobile Insurance Co.*, 561 F.2d 262, 267 (D.C.Cir. 1977).

Acknowledging that the alleged vertical arrangements presented a more difficult question under the McCarran Act, the court nonetheless held that "the alleged agreements with preferred shops and the asserted group boycott of non-cooperative shops are connected closely enough to the contractual relationships between appellees and their policyholders, and with the reliability, interpretation, and enforcement of those contracts, to qualify as the business of insurance." *Id.* at 268 (footnote omitted). In support of its conclusion, the court cited the District Court decision in *Royal Drug Co. v. Group Life & Health Insurance Co.*, 415 F.Supp. 343, 347–48 (W.D.Tex.1976), that

8. The District Court concluded that the "concept of state 'regulation,' for McCarran Act purposes, is one of considerable breadth." 406 F.Supp. at 30. In its view,

[s]uch exemption is not affected by whether or not there is a conflict between the Federal antitrust laws and state regulations, whether or not the state enforces its regulations or whether such enforcement is effective. The mere existence of regulatory statutes capable of being enforced apparently is all that is required for the McCarran Act exemption to be applicable.

*Id.* This broad interpretation has been subject to criticism. We do not reach the issue wheth-

er the court correctly interpreted or applied this provision of the McCarran Act because it has never been raised on appeal. *See* notes 16–17 *infra* and accompanying text.

9. The District Court analyzed the state law in Virginia and Pennsylvania because the appellants did business in those two states. 406 F.Supp. at 30.

10. The District Court suggested that the "boycott" exception applied only to "blacklisting" by insurance companies of other companies or agents. 406 F.Supp. at 32.

was subsequently rejected by the Fifth Circuit and by the Supreme Court. The court also emphasized "the close relationship between the cost of reimbursing damage claims . . . and the insurance rates charged by appellees," an approach later criticized by commentators.[11] 561 F.2d at 268. Finally, although the court rejected the District Court's narrow interpretation of the McCarran Act's "boycott" exception, *id.* at 271–75, it nevertheless affirmed the grant of summary judgment on this issue because it found that even after three years of extensive discovery appellants were "unable to point to any evidence whatsoever" that supported their boycott claim. *Id.* at 276.[12]

## C. *The Supreme Court's Remand in Light of* Royal Drug

On March 5, 1979, the Supreme Court vacated and remanded the Court of Appeals decision for further consideration in light of the decision in *Group Life & Health Insurance Co. v. Royal Drug Co.*, 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979). *Proctor v. State Farm Mutual Automobile Insurance Co.*, 440 U.S. 942, 99 S.Ct. 1417, 59 L.Ed.2d 631 (1979). On November 9, 1979, this court issued an order remanding the case to the District Court for further consideration in light of the Supreme Court's action.

Because the Supreme Court's decision in *Royal Drug* was the basis for the remand and continued proceedings in this case, it is appropriate to set out the facts and the Court's reasoning in *Royal Drug* in some detail. In *Royal Drug*, a group of pharmacies in Texas sued Blue Shield of Texas and three other pharmacies, alleging that they had violated section 1 of the Sherman Act by entering into agreements fixing the retail prices of prescription drugs. The Supreme Court, in an opinion by Justice Stewart for a five-Justice majority, held that the challenged agreements did not constitute the "business of insurance" under the McCarran Act.

The "pharmacy agreements" at issue in *Royal Drug* were related to the insurance policies issued by Blue Shield. Under the policies, insured persons could purchase prescription drugs for the price of two dollars from any pharmacy that had entered into a "pharmacy agreement" with Blue Shield. Alternatively, policyholders could purchase drugs from a non-participating pharmacy at the full price charged by the pharmacy, and Blue Shield would reimburse them for seventy-five percent of the difference between that price and two dollars. The pharmacy agreements required participating pharmacies to furnish prescription drugs to Blue Shield policyholders for no more than two dollars and required Blue Shield to reimburse the pharmacies for their actual cost of acquiring the drugs. In effect, the agreements limited the participating pharmacies' markup to two dollars per item. *Royal Drug*, 440 U.S. at 209–10, 99 S.Ct. at 1072.

The Court began its analysis of whether the pharmacy agreements fell within the protection of the McCarran Act by emphasizing that the language of that statute exempts from the antitrust laws the "business of insurance," not the "business of insurers." *Id.* at 211, 99 S.Ct. at 1073. It focused on two elements in defining the "business of insurance": (1) the spreading and underwriting of risk, and (2) the contractual relationship between the insurer and the insured. Analyzing the first element, the Court rejected the petitioners' argument that the pharmacy agreements involved the underwriting of risk.

> The fallacy of petitioners' position is that they confuse the obligations of Blue Shield under its insurance policies, which insure against the risk that policyholders will be unable to pay for prescription drugs during the period of coverage, and the agreements between Blue Shield and the participating pharmacies, which serve only to minimize the costs Blue Shield

---

**11.** *See* note 31 *infra.*

**12.** Judge Wright dissented on the ground that there was adequate record evidence to defeat

summary judgment on the "boycott" issue. 561 F.2d at 276–77 (Wright, J., dissenting).

incurs in fulfilling its underwriting obligations. . . .

The Pharmacy Agreements thus do not involve any underwriting or spreading of risk, but are merely arrangements for the purchase of goods and services by Blue Shield. . . . Such cost-savings arrangements may well be sound business practice, and may well inure ultimately to the benefit of policyholders in the form of lower premiums, but they are not the "business of insurance."

440 U.S. at 213–14, 99 S.Ct. at 1074 (footnotes omitted). Emphasizing the "important distinction between risk underwriting and risk reduction," id. at 214 n.12, 99 S.Ct. at 1074 n.12, the Court concluded that "[t]he Pharmacy Agreements are thus legally indistinguishable from countless other business arrangements that may be made by insurance companies to keep their costs low and thereby also keep low the level of premiums charged to their policyholders." Id. at 215, 99 S.Ct. at 1075.

Turning to the second element of its test, the Court stated that the pharmacy agreements were not between insurer and insured; rather, they were separate contractual arrangements for the purchase of goods and services other than insurance. The Court rejected as "prov[ing] too much" the argument that the agreements "so closely affect the 'reliability, interpretation, and enforcement' of the insurance contract and 'relate so closely to their status as reliable insurers' as to fall within the exempted area." Id. at 216, 99 S.Ct. at 1075 (quoting SEC v. National Securities, Inc., 393 U.S. 453, 460, 89 S.Ct. 564, 568, 21 L.Ed.2d 668 (1969)) (footnote omitted). If every business decision affecting costs and premiums fell within the protection of the McCarran Act, the Court reasoned, the Act would in effect exempt the "business of insurance companies" rather than the "business of insurance." 440 U.S. at 216–17, 99 S.Ct. at 1075–76.

The Court found that the legislative history of the McCarran Act supported its narrow interpretation of the term "business of insurance." It explained that the applicability of the federal antitrust laws to insurance companies was a "secondary concern" in the passage of the McCarran Act and pointed out that Congress had rejected an earlier bill that would have entirely exempted the insurance industry from the antitrust laws. Id. at 218–20, 99 S.Ct. at 1076–77. The legislative history of the Act revealed that Congress' major concern in enacting the "business of insurance" exemption was to protect from the antitrust laws combined efforts in collecting and sharing statistical data and cooperative ratemaking by insurance companies. These concerted activities were viewed as essential for accurate and efficient underwriting of risk. The Court found nothing in that history to suggest that Congress intended the exemption to be so broad as to include the purchase of goods and services from outside the insurance industry. Id. at 220–24, 99 S.Ct. at 1077–79. Finally, the Court noted that its interpretation of the McCarran Act exemption was consistent with the principle that exemptions from the antitrust laws should be narrowly construed. Id. at 231, 99 S.Ct. at 1083.

Justice Brennan's dissent criticized the majority's rigid test for determining which practices constitute the "business of insurance." He, along with Chief Justice Burger, Justice Marshall and Justice Powell, would have held that the McCarran Act protected the pharmacy agreements "because they (1) directly obtain the very benefits promised in the policy and therefore directly affect rates, cost, and insurer reliability, and (2) themselves constitute a critical element of risk 'prediction.' " Id. at 252–53, 99 S.Ct. at 1093–94 (Brennan, J., dissenting) (footnotes omitted).

D.  The District Court Decision on Remand

On remand, the District Court granted the renewed motions for summary judgment filed by all five appellees. Proctor v. State Farm Mutual Automobile Insurance Co., [1980–81] Trade Cases (CCH) ¶ 63,591 (D.D.C.1980). In a memorandum opinion, the District Court held that the decision in Royal Drug did not disturb the prior ruling

of the Court of Appeals that the alleged horizontal agreement among the insurance companies constituted the "business of insurance" under the McCarran Act. Three reasons were offered for this holding: (1) the issue decided in *Royal Drug* concerned only *vertical* agreements between a single insurer and several pharmacies; (2) the alleged horizontal agreement met the *Royal Drug* criteria for determining what constitutes the business of insurance because the agreement "is directly related to the insurance relationship between insurer and insured and involves claims procedures, which are an important determinant of commonly made rates and the spreading of risk;" and (3) the Solicitor General's amicus curiae brief in *Royal Drug* specifically compared the pharmacy agreements in *Royal Drug* to the horizontal agreement in *Proctor* and concluded that the horizontal agreement should be regarded as the "business of insurance" because it is a wholly intra-industry agreement concerning payment of claims. *Id.* at 77,139–40 (footnote omitted).

The District Court assumed that the Supreme Court had remanded the case because the Court of Appeals had cited the lower court opinion in *Royal Drug*, which was subsequently reversed, in support of its holding on the vertical claim. The District Court concluded, however, that the written provider agreements in *Royal Drug* were distinguishable from the vertical arrangements in this case and that *Royal Drug* probably did not alter the Court of Appeals decision that the vertical arrangements constituted the "business of insurance." The District Court also held that, even if the holding of the Court of Appeals on the vertical arrangements was wrong in light of *Royal Drug,* summary judgment was still appropriate because the alleged vertical arrangements were lawful under standard antitrust analysis. In reaching this conclusion, the District Court emphasized that the record was devoid of any evidentiary support for appellants' allegations of coercion and intimidation of repair shops, and that

appellants had abandoned any claims of a boycott of non-cooperative shops. *Id.* at 77,140–41.

## · II. ISSUES ON APPEAL

Appellants have winnowed somewhat their arguments on appeal. As the District Court noted below, appellants expressly abandoned any claim of boycott in their opposition to appellees' renewed motions for summary judgment. *See* Memorandum of Plaintiffs in Opposition to Defendants' Renewed Motions for Summary Judgment, at 8, 9 n.\*, 19–20, 32–33, Record, vol. 11, entry no. 312 [hereinafter cited as "Plaintiffs' Memorandum"]. Both in their brief and during oral argument on appeal appellants reiterated that they have given up their previous boycott claims. *See* Appellants' Brief at 9, 21–22, 33–34. Nor do appellants contest the District Court's specific findings that: (1) appellants had provided repair services to appellees' policyholders throughout the period of this suit; (2) there was no evidence that appellees had ever attempted to prevent their insureds from dealing with appellants;[13] and (3) there was no evidence in the record to support a claim of coercion or intimidation. *See* Appellants' Brief at 21–22 ("The question of coercion or boycott is no longer an issue in this case.... [T]here is no need to argue either boycott or coercion.").

Arguably, appellants' sole argument on appeal concerns the alleged horizontal price-fixing agreement. *See* Plaintiffs' Memorandum at 9 ("In determining the sufficiency of the defendants' renewed motions, their conduct must be viewed only with respect to plaintiffs' horizontal price fixing claim under the federal antitrust law."); Appellants' Brief at 22 ("The only remaining issue is whether there is credible evidence from which a jury could reasonably infer that defendants combined to fix the prices they would pay to automobile body shops for the repair of automobiles for which they were insurers. It is the legality

---

**13.** The first District Court opinion, 406 F.Supp. at 31, and the Court of Appeals decision, 561 F.2d at 276, also found that appellants' services had been used by appellees' insureds and that there was no evidence to support a claim of boycott.

of such a horizontal price-fixing conspiracy under the Federal antitrust laws which now must be determined in this case.").[14] Appellants have never argued that the vertical arrangements are themselves unlawful (*i.e.*, independent of the alleged horizontal agreement), nor have they contested the District Court's holding that the arrangements do not violate the antitrust laws. Appellants' brief discusses at great length, however, the role the vertical arrangements played in implementing the horizontal price-fixing agreement. Consequently, appellants have preserved the argument that the vertical arrangements are unlawful because they were intended to implement an unlawful horizontal restraint of trade.[15]

Finally, appellants have never challenged the holding in the first District Court decision that the activities of the insurers in this case were sufficiently regulated by the laws of Virginia and Pennsylvania to satisfy the McCarran Act requirement of state regulation. *See* text accompanying notes 8–9 *supra.* That holding has been criticized,[16] and, although we recognize that as a general matter a stricter interpretation of this McCarran Act requirement might be appropriate,[17] that issue is simply not before us.

In deciding the issues that remain on appeal, we bear in mind our limited role in reviewing a grant of summary judgment. Under Fed.R.Civ.P. 56(c), summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Although the moving party carries the burden of proof, *United States v. General Motors Corp.*, 518 F.2d 420, 441 (D.C.Cir.1975), when a motion for summary judgment is made and properly supported under Rule 56, the opposing party must set forth specific facts and present evidence showing the existence of a genuine issue; the opposing party *"may not rest on the mere allegations or denials of his pleading."* Fed.R.Civ.P. 56(e) (emphasis added); 10 C. Wright & A. Miller, Federal Practice and Procedure § 2721, at 475 (1973). Summary judgment was intended to "eliminate[ ] useless trials by permitting a party 'to pierce

---

**14.** Indeed, in their brief, appellants offer a single issue in their "STATEMENT OF ISSUE PRESENTED FOR REVIEW":

DID THE DISTRICT COURT ACT CONTRARY TO THE SUPREME COURT DECISION IN *ROYAL DRUG* IN GRANTING APPELLEES' SUMMARY JUDGMENT MOTION ON THE FINDING THAT A CONSPIRACY OR COMBINATION AMONG INSURERS TO FIX LABOR RATES PAID TO AUTOMOBILE BODY REPAIR REPAIR [*sic*] SHOPS IS THE "BUSINESS OF INSURANCE" WITHIN THE MEANING OF THE McCARRAN–FERGUSON ACT?

Appellants' Brief at 1–2.

**15.** We note, however, that much of the discussion in appellants' brief of the vertical arrangements seems to be offered as much to show the *existence* of a horizontal price-fixing agreement as to show the illegality of those arrangements.

**16.** Weller, *The McCarran-Ferguson Act's Antitrust Exemption For Insurance: Language, History and Policy*, 1978 Duke L.J. 587, 633–34 [hereinafter cited as "Weller"].

**17.** The majority of courts have found the McCarran Act's "state regulation" requirement easily satisfied by a general scheme for regulating the conduct of insurance companies. *E.g., Ohio AFL–CIO v. Insurance Rating Bd.*, 451 F.2d 1178 (6th Cir. 1971), *cert. denied*, 409 U.S.

917, 93 S.Ct. 215, 34 L.Ed.2d 180 (1972); *see* Sullivan & Wiley, *Recent Antitrust Developments: Defining the Scope of Exemptions, Expanding Coverage, and Refining the Rule of Reason*, 27 U.C.L.A.L.Rev. 265, 289 (1979) [hereinafter cited as "Sullivan & Wiley"].

Other courts have, however, applied a stricter standard. *See, e.g., United States v. Crocker Nat'l Corp.*, 656 F.2d 428, 452–55 (9th Cir. 1981) (state law must regulate the specific practices challenged under federal antitrust laws; state and federal law should be accommodated when possible); *cf. SEC v. National Secs., Inc.*, 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969) (insurance company merger properly challenged under federal securities laws; state statute designed to protect policyholders, under which state approved the challenged merger, held not in conflict with federal securities laws). Commentators have also argued for more rigorous scrutiny of state regulation. *E.g.*, Weller, *supra* note 16, at 602–19; Weller, *To Preempt or To Accommodate: The Question of State and Federal Antitrust Laws Under the McCarran-Ferguson Act*, 9 U.Toledo L.Rev. 421 (1978); Carlson, *The Insurance Exemption from the Antitrust Laws*, 57 Tex.L. Rev. 1127, 1158–61 (1979) [hereinafter cited as "Carlson"]; Sullivan & Wiley, *supra*, at 288–91.

the pleadings and to assess the proof to see whether there is a genuine need for trial.'" *United States v. General Motors Corp.*, 518 F.2d at 441 (quoting Advisory Committee's Note on Proposed Amendments to Rule 56, 31 F.R.D. 648 (1962)). Applying these standards at the appellate level, we must view the record and any inferences to be drawn from it in the light most favorable to the party who opposed summary judgment, and any doubts about the propriety of granting summary judgment must be resolved in that party's favor. *E.g., United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *see* 10 C. Wright & A. Miller, *supra*, § 2716, at 430–32. Our consideration is limited to those materials that were before the District Court. *Id.* § 2716, at 435.

## III. APPELLANTS' CLAIM OF A HORIZONTAL RESTRAINT OF TRADE

The heart of appellants' case is their claim of a horizontal price-fixing agreement among appellees. We therefore first review the District Court's holding that

[t]he decision in *Royal Drug* does not reach or disturb the "core" ruling of the Court of Appeals that a horizontal agreement among insurers to pay insureds' claims on the basis of the prevailing labor rate in accordance with a common formula, constituted the "business of insurance" within the McCarran-Ferguson Act and, even if proved, was therefore exempt from the anti-trust laws.

*Proctor II*, [1980–81] Trade Cases (CCH) ¶ 63,591, at 77,139. For the purpose of reviewing the District Court's grant of summary judgment on this issue, we assume the existence of the agreement as alleged by appellants. As discussed below, there is some uncertainty about how the Supreme Court would apply its interpretation of the "business of insurance" in *Royal Drug* to

the facts of this case, and it is likely that the Court will soon reexamine that interpretation.[18] Therefore, we also address a question not reached by the District Court: whether, assuming McCarran Act immunity is unavailable, and based on the evidence in the record, there is any genuine issue of material fact sufficient to enable appellants to withstand summary judgment on their antitrust claim pertaining to the alleged horizontal agreement.

### A. Whether the Alleged Horizontal Agreement Constitutes the "Business of Insurance" Under the McCarran Act

To fall within the McCarran Act exemption, the horizontal agreement must constitute the "business of insurance" and be "regulated by State Law," 15 U.S.C. § 1012(b) (1976), and must not constitute an "agreement to ... or [an] act of boycott, coercion, or intimidation." *Id.* § 1013(b). As noted above, appellants have abandoned their claim of boycott, coercion, or intimidation, and have never challenged the ruling that appellees' practices are "regulated by State Law." Accordingly, we address only the question whether the alleged horizontal agreement constitutes the "business of insurance" under the McCarran Act.

### 1. The Interpretation of the "Business of Insurance" After Royal Drug

The Supreme Court in *Royal Drug* focused on two criteria in defining the "business of insurance": (1) the spreading and underwriting of risk (seemingly as opposed to the mere reduction of risk), and (2) the relationship between insurer and insured. Courts and commentators have generally agreed that the articulation and application of these criteria in *Royal Drug* significantly narrowed the scope of the term "business of insurance."[19] There has been disagreement and confusion, however, about the nature

---

**18.** In two cases this term the Supreme Court has granted petitions for certiorari involving questions of whether certain insurance company practices constitute the "business of insurance" under the McCarran Act. *Pireno v. New York State Chiropractic Ass'n*, 650 F.2d 387 (2d Cir. 1981), *cert. granted*, —— U.S. ——, 102

S.Ct. 595, 70 L.Ed.2d 587 (1981) (Nos. 81–389, 81–390); *McCready v. Blue Shield*, 649 F.2d 228 (4th Cir. 1981), *cert. granted*, —— U.S. ——, 102 S.Ct. 500, 70 L.Ed.2d 376 (1981).

**19.** *See* notes 21–24 *infra* and accompanying text.

and extent of *Royal Drug*'s restriction of the "business of insurance" exemption. The opinion in *Royal Drug* does not explain, for example, the relationship between the "risk-spreading" factor and the "between insurer and insured" factor, or the weight to be given each factor. Nor does it discuss the connection between these factors and the emphasis in the legislative history on exempting cooperative ratemaking and sharing of statistical data from antitrust attack.[20]

Some commentators have viewed the Court's statements that the business of insurance involves the spreading and underwriting of risk—but not the mere reduction of risk—as the crux of the *Royal Drug* decision. They have recognized that, taken literally, this test would exclude from McCarran Act protection many activities traditionally thought to be the business of insurance; indeed, almost every practice outside of the basic insurance contract itself might be excluded.[21] Other commentators have interpreted *Royal Drug* less restric-

tively, suggesting, for example, that claims adjusting and settlement, and horizontal agreements pertaining to claims settlement, also constitute the "business of insurance" under *Royal Drug*.[22]

More importantly, the federal courts attempting to apply *Royal Drug* have differed widely in their approaches to defining the "business of insurance" and in the results they have reached. The Second Circuit has offered probably the narrowest interpretation of the "business of insurance" under *Royal Drug*. In *Pireno v. New York State Chiropractic Association*, 650 F.2d 387 (2d Cir. 1981), *cert. granted*, —— U.S. ——, 102 S.Ct. 595, 70 L.Ed.2d 587 (1981), the court considered an antitrust challenge to an insurer's practice of submitting claims for chiropractic services to a review committee, composed of chiropractors, for a determination whether the services rendered and the fees charged are "reasonable" within the meaning of the insurance policy. Analyzing the Supreme Court's opinion in *Royal Drug*, it concluded that, "under *Royal Drug*,

**20.** As noted in one commentary on *Royal Drug*:

> There is a question about the relationship of the "between insurer and insured" and the "risk spreading" tests. The Court refers to the latter as "an indispensable characteristic of insurance," [440 U.S.] at 212 [99 S.Ct. at 1073], while the former is only described as "[a]nother commonly understood aspect of the business of insurance," *id.* at 215 [99 S.Ct. at 1075]. This wording suggests that the "between insurer and insured" test is of less importance than the risk spreading requirement. Since Group Life's pharmacy agreements were found to fail on both counts, however, this implication is not a necessary result of the case's holding. The Court's failure to clarify this relationship, as well as its rather unrelated discussion of cooperative ratemaking ... leaves much to be desired by those seeking a confident prediction of the boundaries of "the business of insurance."

Sullivan & Wiley, *supra* note 17, at 282 n.77; *see also* Case Comment, 65 Minn.L.Rev. 1187, 1195–96 (1981).

**21.** *See* Note, *The Definition of "Business of Insurance" Under the McCarran-Ferguson Act After* Royal Drug, 80 Col.L.Rev. 1475, 1478–79 & n.26 (1980) (concluding that, under *Royal Drug*, risk-reducing activities are not the "business of insurance" and that "[a]fter the 'risk-reducing' policy terms are eliminated, all that

remains is the most basic model of the insurance contract," and suggesting that "the Court's second argument [in *Royal Drug*], that the business of insurance is limited to the insurer-policyholder relationship ... seems superfluous"); Sullivan & Wiley, *supra* note 17, at 282–83 (measures to reduce either the magnitude or the probability of risk are not part of the "business of insurance" under *Royal Drug*).

Other commentators have argued that the "business of insurance" does not include any insurance company practice that has an anticompetitive impact outside the insurance industry. *See* Weller, *supra* note 16, at 632; Note, *Qualified Immunity for Insurers Under the McCarran-Ferguson Act*, 46 Geo.Wash.L. Rev. 396, 408 (1978) (proposing, prior to *Royal Drug*, balancing of benefit to policyholders against anticompetitive effects when insurance practice restrains competition in non-insurance market).

**22.** *See* Carlson, *supra* note 17, at 1185–86 (agreement between insurance companies providing formula for reimbursing claims, like the one alleged in *Proctor*, should constitute the "business of insurance" under *Royal Drug*); Case Comment, *supra* note 20, at 1201–02 (claims adjustment should be regarded as the "business of insurance" under *Royal Drug*).

the McCarran-Ferguson anti-trust exemption for 'the business of insurance' is to be strictly limited to only the quintessential insurance functions." *Id.* at 392. Focusing on the underwriting and spreading of risk as the critical determinant of the "business of insurance," the court stated that "an activity or procedure that does not either transfer risk from insured to insurer or spread the risk among insureds is not the business of insurance." *Id.* at 393. Strictly applying this test, it concluded that the peer review process did neither and therefore was not the business of insurance *Id.*[23] The court was unpersuaded by the argument that the peer review committee performed a traditional insurance "adjusting" function, suggesting that claims adjusting and settlement itself might not constitute the "business of insurance" under *Royal Drug. Id.* at 394–95.

Examining the same peer review committee procedure in *Bartholomew v. Virginia Chiropractors Association, Inc.,* 612 F.2d 812 (4th Cir. 1979), *cert. denied,* 446 U.S. 938, 100 S.Ct. 2158, 64 L.Ed.2d 791 (1980), the Fourth Circuit reached the opposite result, holding that the procedure constituted the "business of insurance" under the McCarran Act. Its analysis of *Royal Drug* ignored the "risk-spreading" factor and focused instead on the fact that, in *Royal Drug,* the procuring of prescription drugs through the pharmacy agreements and the offering of insurance were "two segregated and disparate operations." In *Bartholomew,* by contrast, there was "an integration of component acts resulting in a single, composite business-insurance." *Id.* at 817. *See also Ratino v. Medical Service,* [1981–1] Trade Cases (CCH) ¶ 64,144 (D.Md.1981) (following *Bartholomew*).

The Fourth Circuit itself, however, has not been entirely consistent in its approach to interpreting *Royal Drug.* In *Virginia Academy of Clinical Psychologists v. Blue Shield,* 624 F.2d 476 (4th Cir. 1980), *cert. denied,* 450 U.S. 916, 101 S.Ct. 1360, 67 L.Ed.2d 342 (1981), the court held that the refusal of two Blue Shield plans to pay for services rendered by clinical psychologists unless they are billed through a physician did not constitute the "business of insurance" and hence was not immune from antitrust attack. The opinion by Judge Hall, who had dissented on the McCarran Act issue in *Bartholomew,* focused neither on risk-spreading nor on the integration of the challenged activity and the offering of insurance. Rather, the court stated that "[t]he essence of the business of insurance is the relationship between the insurance company and its policyholder." *Id.* at 483. The court found that, as in *Royal Drug,* the challenged practice was "only tangential to that relationship in that it does not affect the benefit conferred upon the subscriber." *Id.* at 483–84.

In light of the divergent approaches taken by courts and commentators, we find it significant that, in antitrust actions brought by automobile body repair shops against insurance companies for allegedly conspiring to fix the price of automobile body repair work, two courts have opted to follow the approach taken by the District Court in its most recent opinion in *Proctor.* In *Quality Auto Body, Inc. v. Allstate Insurance Co.,* 660 F.2d 1195 (7th Cir. 1981), the Seventh Circuit held that a horizontal agreement between automobile insurance companies, virtually identical to the horizontal agreement challenged in this case, was the "business of insurance" because it was a wholly intra-industry agreement that involved claims procedures and because it was akin to cooperative ratemaking. *Id.* at

---

**23.** *See also Portland Retail Druggists Ass'n v. Kaiser Foundation Health Plan,* 662 F.2d 641, 647 (9th Cir. 1981) (under *Royal Drug,* "spreading of risk" is "essential for application of the McCarran-Ferguson defense"); *Hoffman v. Delta Dental Plan,* 517 F.Supp. 564, 568–69 (D.Minn.1981) (insurer's payment formula providing different levels of payment for member and nonmember dentists is not the "business of

insurance" under *Royal Drug,* primarily because it merely minimizes costs but does not spread or underwrite risk); *United States v. Title Ins. Rating Bureau,* 517 F.Supp. 1053, 1058 (D.Ariz.1981) (insurers' provision of escrow services to policyholders not "business of insurance" because it does not involve "any actual underwriting of risk-spreading").

1201 & n.4. *Accord, Workman v. State Farm Mutual Automobile Insurance Co.,* 520 F.Supp. 610, 615–16 n.7 (N.D.Cal. 1981).[24]

### 2. *Application of* Royal Drug *to the Facts of this Case*

We do not believe that *Royal Drug* clearly mandates a particular outcome on the horizontal claim in this case. *Royal Drug* did not directly address the question of what types of intra-industry agreements might constitute the "business of insurance,"[25] and, as shown above, its analysis of what constitutes the "business of insurance" has been subject to widely varied interpretations. Despite a lack of clear guidance, after considering *Royal Drug* and applying it to the facts of this case, we conclude that the alleged horizontal agreement among the insurers should be regarded as the "business of insurance."

First, the holding in *Royal Drug* concerned vertical agreements between a single insurer and providers of goods and services other than insurance, and the Court's analysis was tailored to that type of agreement. Moreover, there are indications in the Court's opinion that horizontal, wholly intra-industry agreements should be analyzed differently. For example, the Court emphasized that Congress' primary concern in exempting the "business of insurance" from the antitrust laws was to protect cooperative ratemaking and joint collection and sharing of statistical data by insurance companies. *Royal Drug,* 440 U.S. at 221–24, 99 S.Ct. at 1078–79. In support of its

position, the Court relied in part on a bill submitted by the National Association of Insurance Commissioners (NAIC) prior to the passage of the McCarran Act. The Act that Congress adopted was largely patterned after the original NAIC bill. The Court pointed out that the NAIC bill "enumerated seven specific practices to which the Sherman Act was not to apply," none of which involved contractual arrangements with providers of goods and services like the pharmacy agreements at issue in *Royal Drug. Id.* at 222, 99 S.Ct. at 1078.[26] Rather, "[e]ach of the specific practices involved *intra-industry* cooperative or concerted activities." *Id.* (emphasis added). The Court also noted that Congress may have intended the "business of insurance" exemption to include transactions between an insurer and its agents. It sharply distinguished them from the provider agreements in *Royal Drug,* emphasizing that such transactions between insurers and agents "are wholly intra-industry." *Id.* at 224–25 n.32, 99 S.Ct. at 1079–80 n.32.[27]

The dissent in *Royal Drug,* criticizing the majority's rigid formulation of "the business of insurance," stated that "the Court apparently concedes that arrangements among insurance companies respecting premiums and benefits would constitute the 'business of insurance,' despite their failure to fit within its formula." *Id.* at 244, 99 S.Ct. at 1089 (Brennan, J., dissenting). The dissent concluded that "the legislative history makes it abundantly clear that numerous horizontal agreements between insurance companies which do not technically involve

**24.** In both *Quality Auto Body* and *Workman,* however, the McCarran Act exemption was an alternative holding. Both courts also held that summary judgment was appropriate because the plaintiffs' evidence was inadequate to establish a claim under the Sherman Act.

**25.** The Court in *Royal Drug* did note that the position taken by this Court of Appeals in *Proctor* was in conflict with the position of the Fifth Circuit in *Royal Drug.* 440 U.S. at 208–09 n.2, 99 S.Ct. at 1071–72 n.2. Since the Fifth Circuit in *Royal Drug* decided only whether the pharmacy agreements in that case qualified for exemption as the "business of insurance" and did not even discuss the status of horizontal agreements under the McCarran Act, it is reasonable

to assume that the Court found *Proctor's* ruling on the vertical arrangements, not its ruling on the horizontal claim, in conflict with the Fifth Circuit position.

**26.** *See* 90 Cong.Rec. A4406 (1944) (text of NAIC bill). The seven practices listed in the NAIC bill were not included in the law as enacted.

**27.** *See Thompson v. New York Life Ins. Co.,* 644 F.2d 439 (5th Cir. 1981) (restrictive provisions in insurance agent's contract with insurance company held to constitute the "business of insurance").

the underwriting of risk were regarded by Congress as within the scope of the Act's exemption for the 'business of insurance.' " *Id.*

Finally, it is worth noting that the Solicitor General's amicus curiae brief for the United States in *Royal Drug* specifically distinguished the horizontal agreement in *Proctor* from the agreements at issue in *Royal Drug.* It argued that the agreement in *Proctor* should be viewed as the "business of insurance" largely because it was a "wholly intra-insurance industry agreement[ ] concerning the extent to which particular claims would be paid." Brief for the United States as Amicus Curiae at 31, *Group Life & Health Insurance Co. v. Royal Drug Co.,* 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979), *reprinted in* Defendants' Supp.App. 43.[28]

In light of the foregoing, we think it is fair to say that at least some horizontal agreements among insurers fall within the "business of insurance" exemption, and that the tests in *Royal Drug* for determining what constitutes the "business of insurance" are more easily satisfied by an intra-industry agreement than by a vertical agreement with an entity outside the insurance industry.[29]

Second, we believe that viewing the alleged horizontal agreement in this case as part of the "business of insurance" is consistent with Congress' 'concern about exempting cooperative ratemaking and sharing of statistical data from the antitrust laws. The Court in *Royal Drug* found this concern prominent in the legislative history of the McCarran Act. It looked, for exam-

**28.** The Antitrust Division of the Department of Justice has recently submitted a memorandum for the United States as amicus curiae in an ongoing suit that is factually similar to this one. The memorandum concludes that, under *Royal Drug,* vertical arrangements between individual insurers and automobile body repair shops concerning the price of repairs are not the "business of insurance" under the McCarran Act after *Royal Drug.* Memorandum of the United States as Amicus Curiae at 5–7, *D&B Auto Body, Inc. v. Allstate Ins. Co.,* No. 79–0550 (D.R.I.). By contrast, it concludes that an agreement among insurers "to provide reimbursement only for the competitive or prevailing cost of repair would . . . be immune from the antitrust laws if regulated by state law." *Id.* at 21 (citing the District Court's decision on remand in *Proctor II*). The memorandum also mentions that the McCarran Act would not immunize horizontal "agreements that do not modify the insurer's obligation to the policyholder, but merely relate to the insurance companies' role as purchasers of repair services." *Id.* (citing *Royal Drug*). This statement renders the position of the Antitrust Division somewhat ambiguous, but its approving citation of the District Court's decision in *Proctor II* indicates that it views the horizontal agreement in this case as the "business of insurance."

**29.** We recognize that *Royal Drug* can conceivably be read as establishing a strict subject-matter test of the "business of insurance." This, in fact, seems to be appellants' basic argument on appeal. Under this view of *Royal Drug,* it does not matter whether the agreement is wholly intra-industry or one between an insurer and providers of services outside the insurance in-

dustry. Rather, if the subject matter of the agreement concerns goods or services other than just insurance, the agreement cannot be the "business of insurance," no matter how closely it otherwise pertains to ratemaking or to other practices traditionally regarded as the core of the "business of insurance." We do not accept this argument. If the Court had intended to establish a simple test of the "business of insurance," which would (1) exclude *any* agreement pertaining to the provision of goods and services other than insurance or (2) ban *any* practice having an impact on a non-insurance market, it could have stated the test simply. It did not. Indeed, the Court's decision in *Royal Drug* was specifically tailored to be the vertical agreements it considered in that case. We therefore decline to impose so sweeping an interpretation on *Royal Drug* in the absence of a clearer indication from the Court.

We recognize further that *Royal Drug* can be read to allow a McCarran Act antitrust exemption for intra-industry agreements and/or information sharing only insofar as they pertain to the "distribution of risk according to hazard, experience, and the laws of averages [because] [t]hese factors are not within the control of insuring companies in the sense that the producer or manufacturer may control cost factors." *Royal Drug,* 440 U.S. at 221, 99 S.Ct. at 1078 (quoting from H.R.Rep.No.873, 78th Cong., 1st Sess. 8–9 (1943)). We reject this suggestion primarily because it ignores the views of the majority in *Royal Drug* indicating that horizontal agreements pertaining to cooperative ratemaking, if subject to State regulation, are probably protected by the McCarran Act.

ple, to the report accompanying the NAIC bill, which stressed the need to protect "*combined efforts for statistical and rate-making purposes* . . . ." 440 U.S. at 221–22, 99 S.Ct. at 1078 (quoting 90 Cong.Rec. A4405 (1944) (emphasis added)). This report emphasized the need of small insurance companies and insurers other than life insurance companies for such protection. "In the life [insurance] companies the element of cost can be fixed with . . . a high degree of mathematical certainty . . . ." In other fields of insurance, risks and costs are less predictable. Sharing of statistical data and combined ratemaking efforts were regarded as especially important in these fields, in which "[t]he experience of individual companies is seldom a reliable guide for rate-making purposes." 90 Cong.Rec. A4405 (1944). The Court also cited the floor debates on the McCarran Act and President Roosevelt's remarks upon signing the Act, 440 U.S. at 223–24, 99 S.Ct. at 1079, and concluded that "[b]ecause of the widespread view that it is very difficult to underwrite risks in an informed and responsible way without intra-industry cooperation, the primary concern of both representatives of the insurance industry and the Congress was that cooperative rate-making efforts be exempt from the antitrust laws." *Id.* at 221, 99 S.Ct. at 1078.

Given this view of the legislative history and of the purpose of the Act, it seems clear that Congress intended the exemption to cover the sharing of data on the rate of past losses and other information on the probability that particular losses will occur. Risk probability is only one element of the ratemaking formula, however. Insurers must also factor in the magnitude of loss, *i.e.*, the magnitude of the payments the insurer must make if the loss insured against occurs. *See Owens v. Aetna Life & Casualty Co.*, 654 F.2d 218, 240 (3d Cir. 1981) (Sloviter, J., dissenting), *cert. denied*, —— U.S. ——, 102 S.Ct. 657, 70 L.Ed.2d 631 (1981).[30] In the automobile liability insurance industry, the magnitude of loss includes the cost of repairing (or replacing) the damaged vehicle. The premiums charged by these insurers must directly reflect the cost of repair. We therefore do not believe that Congress, in protecting "cooperative ratemaking," intended to allow concerted action in determining the rate of past losses of insurers and the probability of future losses, but not to allow similar combined efforts in determining how to calculate the expected magnitude of loss, *i.e.*, the current cost of repair. In this case, insurers have allegedly collected and shared data on the cost of repair, labor costs in particular, and agreed on a prevailing hourly labor rate to be used in estimating damage claims. Such activity is closely akin to cooperative ratemaking since it involves a necessary part of the ratemaking process. *See Workman v. State Farm Mutual Automobile Insurance Co.*, 520 F.Supp. 610, 616 n.7 (N.D.Cal.1981).

We recognize, of course, that not everything that affects the level of premiums constitutes the "business of insurance."[31]

**30.** An insurer, of course, is concerned not only with the number or frequency of covered losses that its insureds incur, but also with the extent of financial liability that it will incur as a result of those losses. A prediction of that financial liability is necessary to the proper calculation of insurance premiums and is necessarily a function of the probability of a given loss and the magnitude of that loss if it occurs. *See generally* Affidavit of Alan C. Curry (Vice-President and Actuary of State Farm Mutual Automobile Insurance Co.), Record, vol. 9, entry no. 253 (affidavit in support of March 17, 1975 Motion for Summary Judgment). The "expected cost" to the insurance company of this financial liability is the sum of the products of the probabilities of each covered loss and the cost of that loss should it occur. Mathematically, it is expressed as:

$$E\,(\text{Cost}) = \sum_{i=1}^{n} P\,(\text{Loss}_i) \times \text{Cost}\,(\text{Loss}_i),$$

where $P\,(\text{Loss}_i)$ is the probability of a particular loss, arbitrarily numbered i, taking place. *See, e.g.*, J. Kmenta, Elements of Econometrics 57–59 (1971). While these expected costs may not accurately reflect actual costs for individuals or small groups, they become increasingly accurate for large populations, such as the group of persons insured by an insurance company. *See id.* at 106–07.

**31.** In deciding that the vertical arrangements constituted the "business of insurance," the Court of Appeals in *Proctor* relied in part upon

In fact, the Supreme Court in *Royal Drug* expressed its concern that an "effect on rates" standard would impermissibly expand the "business of insurance" exemption in an unprincipled and uncontainable way:

> The Pharmacy Agreements are thus legally indistinguishable from countless other business arrangements that may be made by insurance companies to keep their costs low and thereby also keep low the level of premiums charged to their policyholders....
>
> ....
>
> At the most, the petitioners have demonstrated that the Pharmacy Agreements result in cost savings to Blue Shield which may be reflected in lower premiums if the cost savings are passed on to policyholders. But, in that sense, every business decision made by an insurance company has some impact on its reliability, its ratemaking, and its status as a reliable insurer.

*Royal Drug*, 440 U.S. at 215, 216–17, 99 S.Ct. at 1075–76. Such concerns, however, are not justified in the context of this case. We stress not that the cost of repair merely *has* an impact on premiums, but that it is *directly* related to the calculation of premiums; it is virtually a part of the ratemaking process.[32] In short, we believe that the alleged horizontal agreement in this case is distinguishable from general cost-saving arrangements that are less directly related to the calculation of rates.[33]

We also recognize that the alleged agreement establishing a common formula for estimating claims strictly speaking may not involve the spreading or underwriting of risk. As noted above, however, *Royal Drug* does not make clear whether this is the exclusive or dispositive test for determining what constitutes the "business of insurance," nor is it clear how the Court's discussion of cooperative ratemaking relates to this test. *See* note 20 *supra.* We do not read *Royal Drug* as precluding us from at least considering the close relationship between the subject of the challenged agreement and the calculation of rates in determining whether the agreement falls within the "business of insurance."[34]

We also take into account the fact that the alleged agreement pertains to the adjusting and settling of claims, a practice

---

the impact on premium levels of costs of damage claim payments. 561 F.2d at 268–70 & n.11. This "effect on insurance rates" approach has been criticized. *See, e.g.,* Nedrow, *The McCarran Controversy: Insurance and the Antitrust Law*, 12 Conn.L.Rev. 205, 238–39 (1980); Weller, *supra* note 16, at 625–26.

**32.** In its first decision in this case, the District Court noted that "the statutes of Pennsylvania and Virginia which control the establishment of insurance rates require that the cost of paying claims be reflected in level of premiums to be charged." *Proctor I*, 406 F.Supp. at 29 n.1. (The Pennsylvania and Virginia statutes require, in part, that, in making all insurance rates, "[d]ue consideration shall be given to past and prospective loss experience within and outside this [state] ...." Pa.Stat.Ann. tit. 40, § 1183 (Purdon 1971); Va.Code § 38.1–252(3) (1981)). Such state regulation does not, of course, necessarily prove that the subject of the regulation is the "business of insurance," but appellants have not challenged the ruling of the District Court on this point.

**33.** We realize that the Supreme Court viewed the pharmacy agreements in *Royal Drug* as indistinguishable from general cost-saving arrangements even though, as the dissent put it, they "directly obtain the very benefits promised in the [insurance] policy and therefore directly affect rates, cost, and insurer reliability ...." *Royal Drug*, 440 U.S. at 252–53, 99 S.Ct. at 1093–94 (Brennan, J., dissenting). However, the pharmacy agreements in *Royal Drug* did not involve the sharing of information for the purpose of ratemaking. Rather, the agreements involved a single insurer's purchase of goods and services from a relatively few providers outside the insurance industry. In contrast, the activity complained of here concerned the sharing of cost data to determine the prevailing rate to be used in writing damage estimates, and thus to determine the expected magnitude of loss payments.

**34.** While this reasoning echoes to an extent the argument of the dissent in *Royal Drug* that the pharmacy agreements constituted the "business of insurance" "because they ... themselves constitute a critical element of risk 'prediction,'" 440 U.S. at 252–53, 99 S.Ct. at 1093–94 (Brennan, J., dissenting), we do not read the majority's opinion as precluding consideration of the extent to which a practice is related to ratemaking, *i.e.*, predicting risk probability or magnitude of loss.

traditionally regarded as part of the insurance business. We respectfully disagree with the suggestion of the Second Circuit in *Pireno* that claims settlement should not be viewed as the "business of insurance" after *Royal Drug*. *Pireno v. New York State Chiropractic Association*, 650 F.2d 387, 394–95 (2d Cir. 1981), *cert. granted,* —— U.S. ——, 102 S.Ct. 595, 70 L.Ed.2d 587 (1981). As this Circuit stated in its earlier opinion in this case: "The determination by the insurance company of the amount to be paid in discharge of this contractual obligation is at the heart of the relationship between insurer and insured . . . ." *Proctor I*, 561 F.2d at 267. Admittedly, the Supreme Court in *Royal Drug* found that the pharmacy agreements did not relate closely enough to the contract between insurer and insured to qualify as the "business of insurance." Unlike the cost of repairing a damaged automobile, however, the price of prescription drugs is readily ascertainable without estimating a number of cost factors. While it may not be dispositive after *Royal Drug*, we think it is permissible, in deciding whether the alleged horizontal agreement constitutes the "business of insurance," to consider the fact that an alleged horizontal agreement involves a complicated determination of the extent of the insurers' liability to their insureds.[35]

Finally, we note that the other courts that have addressed this question have held that the type of horizontal agreement alleged in this case constitutes the "business of insurance." *Quality Auto Body v. Allstate Insurance Co.*, 660 F.2d 1195, 1201 & n.4 (7th Cir. 1981); *Workman v. State Farm Mutual Automobile Insurance Co.*, 520 F.Supp. 610, 615–16 n.7 (N.D.Cal.1981); *cf. Chick's Auto Body v. State Farm Mutual Automobile Insurance Co.*, 168 N.J.Super. 68, 401 A.2d 722 (Super.Ct.Law Div.1979), *aff'd per curiam*, 176 N.J.Super. 320, 423 A.2d 311 (Super.Ct.App.Div.1980) (construing, prior to *Royal Drug*, state law antitrust exemption analogous to McCarran Act).[36]

### B. Inadequacy of Evidentiary Support for Appellants' Claim of a Horizontal Price-Fixing Agreement or Conspiracy

Given the uncertainty in the state of the law concerning the "business of insurance" exemption, which the Supreme Court may soon resolve, we reach a second issue, not reached by the District Court: whether, assuming that the McCarran Act does not exempt the alleged horizontal agreement, appellees have demonstrated the absence of any genuine issue of fact material to appellants' price-fixing claim and that they are entitled to a judgment as a matter of law.[37]

### 1. Scope of Review by an Appellate Court

The Supreme Court has noted that as a "general rule . . . a federal appellate court does not consider an issue not passed

---

**35.** *See* note 33 *supra*.

**36.** Appellants rely on *Liberty Glass Co. v. Allstate Ins. Co.*, 607 F.2d 135 (5th Cir. 1979). In that case, however, the court considered, and found unprotected by the McCarran Act, an "arrangement between the insurers and the manufacturer and installer of automobile replacement glass . . . ." *Id.* at 137. Although more than one insurer was involved, the arrangement considered was essentially a vertical one, initiated by the glass manufacturer allegedly for the purpose of effectuating a scheme of price-fixing, price discrimination, territorial market allocation, monopolization, and elimination of competition in the automobile glass replacement market. *Id.* at 136. That arrangement is thus distinguishable from appellants' claim of a price-fixing agreement among appellees in this case.

**37.** Appellees rely on discovery materials already in the record. *See, e.g.,* Defendants' Supp.App. 443–66 (Allstate "Standard Practice Manual" and correspondence from repair shops informing insurers of their current rates and services); note 59 *infra* (deposition testimony of appellants indicating that hourly labor rates used in different appellees' damage estimates vary and that repair shops set their own labor rates). Appellees also specifically argue that the same discovery materials relied on by appellants to support their claim of a horizontal price-fixing conspiracy provide no support for that claim and, in fact, show the absence of such a price-fixing conspiracy. We have conducted an independent review of those materials, giving appellants the benefit of all reasonable inferences to be drawn from them, in determining whether there is a genuine issue of material fact and whether appellees are entitled to judgment as a matter of law.

upon below. *Singleton v. Wulff*, 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976). Nonetheless, as the Court made clear,

> [t]he matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases.

*Id.* at 121, 96 S.Ct. at 2877. *Singleton* "announce[d] no general rule," because the Court recognized that "[c]ertainly there are circumstances in which a federal appellate court is justified in resolving an issue not passed on below . . . ." *Id.* Specifically, an appellate court may affirm a grant of summary judgment on a ground not relied upon by the lower court, provided "the opposing party [has had] a fair 'opportunity to dispute the facts material' to the new theory." *United States v. General Motors Corp.*, 518 F.2d 420, 441 (D.C.Cir.1975) (quoting *Fountain v. Filson*, 336 U.S. 681, 683, 69 S.Ct. 754, 755, 93 L.Ed. 971 (1949)); *accord, Rich v. United States Lines, Inc.*, 596 F.2d 541, 551 (3d Cir. 1979); *Calnetics Corp. v. Volkswagen of America, Inc.*, 532 F.2d 674, 682 (9th Cir.), *cert. denied*, 429 U.S. 940, 97 S.Ct. 355, 50 L.Ed.2d 309 (1976); 10 C. Wright & A. Miller, Federal Practice and Procedure § 2716, at 439–41 (1973).

In this case, appellants not only have had a fair opportunity to dispute the contention that they have produced inadequate evidence on their horizontal price-fixing claim to withstand a motion for summary judgment, they have made this issue a major part of their presentation both to the District Court and to this court on appeal. The renewed motions for summary judgment filed by three of the appellees were based on part on the argument that appellants had produced no evidence to support their claim.[38] The major portion of appellants' memorandum in opposition to the renewed motions for summary judgment was devot-ed to demonstrating that there was sufficient evidence in the record to withstand summary judgment on their horizontal claim. *See* Plaintiffs' Memorandum at 9–35. In addition, much of appellants' brief on appeal is an effort to show that they have submitted adequate evidence of a horizontal price-fixing conspiracy to defeat a motion for summary judgment on that issue. *See* Appellants' Brief at 22–35. After arguing that the McCarran Act exemption does not apply to the activities they challenge, appellants explicitly state:

> The only remaining issue is whether there is credible evidence from which a jury could reasonably infer that defendants combined to fix the prices they would pay to automobile body shops for the repair of automobiles for which they were insurers.
>
> It is the legality of such a horizontal price-fixing conspiracy under the Federal antitrust laws which now must be determined in this case. Neither the District Court nor the previous Court of Appeals' opinion in this case has considered that issue.
>
> On the basis of documents alone, there is more than sufficient evidence to make this question a jury issue rather than one to be determined by summary procedures.
>
> . . . .
>
> In this case, there is ample evidence to prevent a summary disposition of plaintiffs' claims. The facts presented and the inferences to be drawn therefrom with respect to the existence of an unlawful price fixing conspiracy must be resolved by a jury.

Appellants' Brief at 22, 35. Given appellants' arguments below and on appeal, and bearing in mind that this case has been litigated for ten years, during which time appellants have engaged in extensive discovery, we think appellants have had a fair opportunity to contest, and have in fact

---

**38.** *See* Supplemental Memorandum of the Travelers Indemnity Company in Support of Its Renewed Motion for Summary Judgment, Defendants' Supp.App. 123, 127–29; Memorandum of Points and Authorities in Support of Defendant Nationwide Mutual Insurance Com-pany's Renewed Motion for Summary Judgment, *id.* at 219, 238–43; Supplementary Statement of Allstate Insurance Company Renewing Its Pending Motion for Summary Judgment, *id.* at 259, 260–61.

contested, the assertion that they have presented inadequate evidence of a horizontal price-fixing conspiracy to defeat a motion for summary judgment on that issue. By deciding this question on appeal, we are not depriving them of that opportunity or working any unfairness. *See Grace v. Burger*, 665 F.2d 1193, 1197 n.9 (D.C.Cir. 1981).

## 2. Basic Antitrust Principles Governing Appellants' Claim

On the merits of this question, we first set forth the basic antitrust principles that govern our consideration of appellants' claim. Some type of concerted action is required to establish a violation of section 1 of the Sherman Act. *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). Appellants have alleged an agreement among appellees to fix prices.[39] Although they purport to have offered direct evidence of such an agreement, we note that circumstantial evidence may be relied on to prove the existence of an agreement or conspiracy to fix prices. *E.g., Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939); *Weit v. Continental Illinois National Bank & Trust Co.*, 641 F.2d 457, 462 (7th Cir. 1981), *petition for cert. filed*, 50 U.S.L.W. 3023 (U.S. July 10, 1981) (No. 81–152).

Parallel business behavior alone, however, is inadequate to create an inference of concerted action necessary to establish a Sherman Act violation. *E.g., First National Bank v. Cities Service Co.*, 391 U.S. 253, 279–80, 88 S.Ct. 1575, 1587–88, 20 L.Ed.2d 569 (1968); *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.*, 346 U.S. 537, 541, 74 S.Ct. 257, 259, 98 L.Ed. 273 (1954); *Federal Prescription Service, Inc. v. American Pharmaceutical Associa-tion*, 663 F.2d 253, 267 (D.C.Cir.1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 1293, 71 L.Ed.2d 472 (1982); *Weit v. Continental Illinois National Bank*, 641 F.2d at 462–63; *Independent Iron Works, Inc. v. United States Steel Corp.*, 322 F.2d 656, 661 (9th Cir.), *cert. denied*, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 165 (1963). Only when the observed parallel behavior is inconsistent with the behavior to be expected from each actor individually pursuing its own economic interest may an agreement be inferred from the parallel conduct. *E.g., Federal Prescription Service*, 663 F.2d at 267; *Admiral Theatre Corp. v. Douglas Theatre Co.*, 585 F.2d 877, 884 (8th Cir. 1978); *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 446 (3d Cir. 1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978); *Venzie Corp. v. United States Mineral Products Co.*, 521 F.2d 1309, 1314 (3d Cir. 1975); *Workman v. State Farm Mutual Automobile Insurance Co.*, 520 F.Supp. 610, 617, 620–22 (N.D.Cal. 1981); Turner, *The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal*, 75 Harv. L.Rev. 655, 657–59, 681 (1962). For example, evidence that appellees have, at times, used the same hourly labor rate in estimating damage claims, without more, does not demonstrate the existence of a conspiracy or agreement in violation of the Sherman Act. *Quality Auto Body, Inc. v. Allstate Insurance Co.*, 660 F.2d 1195, 1200–01 (7th Cir. 1981).

## 3. The Record Evidence in this Case

We have examined all of the record evidence [40] cited by appellants in support of their allegation of a horizontal price-fixing agreement or conspiracy. Having done this, we find that none of this evidence supports appellants' allegation or creates any inference of conspiracy. We conclude

---

**39.** The Sherman Act prohibits price-fixing by buyers as well as sellers. *E.g., Mandeville Island Farms, Inc. v. American Crystal Sugar Co.*, 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328 (1948); *Cackling Acres, Inc. v. Olson Farms, Inc.*, 541 F.2d 242 (10th Cir. 1976), *cert. denied*, 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977).

**40.** We have not reviewed the deposition testimony of the owners of two automobile body repair shops, Al Spina and Darrell Johnson, cited by appellants. These depositions apparently were not filed with the court or recorded on the docket, and are not part of the record on appeal.

that no rational jury could find from appellants' evidence that appellees had conspired to fix the price of automobile body repair work and hold that it is inadequate to defeat a motion for summary judgment against appellants.

### (a) *Evidence Cited in Appellants' Brief on Appeal*

Appellants' brief contains certain *allegations* which, if supported, might be sufficient to require a trial on the claim of a horizontal conspiracy or agreement by appellees. None of these allegations, however, is supported. For example, appellants state: "In approximately 1969, as the recently produced Liberty Mutual documents confirm, defendants engaged in a series of meetings in which they agreed to a common formula to be used in the adjusting and settling of automobile damage repair claims." Appellants' Brief at 28. The only document cited in support of this proposition, App. 191A, is a memorandum produced by appellee Liberty Mutual, which discusses a meeting between a representative of an insurance company, presumably Liberty Mutual, and the owners of several "referral" repair shops used by that company. Nothing in the document refers to any meetings between representatives of different insurance companies. Similarly, appellants state: "Defendants . . . creat[ed] the fiction of a 'prevailing' hourly rate in a given area and agree[d] among themselves to pay plaintiffs and others similarly situated an amount for the repair of an automobile computed at the fixed hourly rate." Appellants' Brief at 6. One of the documents cited to support this statement is an innocuous, handwritten note labelled "Nationwide Insurance Correspondence," which makes no mention of hourly labor rates. App. 168A.[41] The only other document cited is a Liberty Mutual memorandum discussing Travelers Indemnity Company's use of "staff appraisers," as opposed to "independent appraisers," in handling automobile damage and homeowners claims. App. 293A–96A.

Appellants cite a number of documents to support their contentions that appellees "fixed a common hourly rate . . . at a particular dollar amount," attempted to "present a uniform insurance industry front with regard to the imposition of a single 'prevailing' labor rate" and tried to force repair shops to operate at unprofitable rates. Appellants' Brief at 29–30. The documents cited do not show any concerted activity by appellees. One document discusses Allstate's efforts to resist a uniform increase in rates by an organization of local repair shops and the refusal of other insurance companies to similarly resist the rate increase. App. 126A–27A. The other two documents discuss Nationwide's analysis of rate increases by local garages. One of them complains that Allstate had raised the hourly labor rate it used in writing damage estimates, making it more difficult for Nationwide to find shops willing to do work at a lower rate. Both documents conclude that Nationwide may have to raise slightly the rate it used in writing estimates. App. 136A–41A. If anything, these documents show that repair shops themselves initiated increases in their labor rates, to which certain appellees reluctantly, and independently, acceded. They certainly cannot create

---

**41.** This document reads: "Charlie, here is the first one of these received for some time. I expect more. I believe James Lacey is currently pres of [illegible] Auto Body Assn. (I'm not sure)" App. 168A. (There is no indication in this document, or in those immediately preceding and following it in the Appendix, as to what the words "one of these" refer to.) Appellants cite this document in support of a number of other allegations in their brief. It is the only document cited to support the statement that "[r]eadjustments to the 'prevailing' rate were made with great reluctance and only under the most adverse circumstances." Appellants' Brief at 30. It is also cited for the following allegations: "The matter of 'prevailing' labor rates also was discussed at claimsmen's association meetings. There was a continuous exchange of information regarding 'prevailing' rates among defendants' top executives and field personnel. It was an item of vital concern to the defendants and one which they monitored closely." *Id.* at 31. The only other document cited in support of these allegations is a page from an Allstate "Claim Training" manual which shows only that rising repair costs were of concern to Allstate. App. 125A.

an inference of conspiracy between appellees Allstate and Nationwide.

Appellants rely heavily upon a series of "Home Office Claims" memoranda released by Liberty Mutual in April 1980. These memoranda, written by E. A. Carr, an officer of Liberty Mutual, basically summarize information obtained in his interviews with representatives of insurance companies throughout the country concerning their methods and procedures for handling a variety of claims, including automobile damage claims. Based on this information, Mr. Carr recommended, and Liberty Mutual adopted, a claims-handling system different from those used by the other companies.[42] Appellants contend that "virtually each" of these documents discusses "body shop hourly rates." Appellants' Brief at 23. In fact, none of the documents cited by appellants discusses rates charged for automobile repair work. App. 281A–315A.[43] Appellants allege that "[t]he top level officers of each of the defendant companies engaged in a series of meetings to exchange information among themselves as to how 'the industry' should respond to the rising cost of payments to repair shops." *Id.* at 25. The same documents are cited in support of this allegation, App. 281A–315A, *i.e.*, Mr. Carr's memoranda summarizing the claims-han-

dling procedures used by eight insurance companies, including appellees,[44] and one memorandum containing Mr. Carr's conclusions and recommendations to Liberty Mutual about claims-handling procedures. None of the documents refers to any meetings between officers of appellees, other than their meetings with Mr. Carr. Nor do they contain any information about the prices charged by automobile repair shops or any suggestion of concerted action by appellees to impose a specified labor rate on repair shops.

Many of the documents cited in appellants' brief are cited to support statements about dealings between certain appellees and "referral" or "preferred" or "backup" repair shops. Appellants' Brief at 26–27, 32–34. Our review of these documents reveals that they may be relevant to appellants' claim concerning vertical restraints, but they contain no evidence that appellees conspired to fix the hourly labor rate or to use an agreed rate in writing damage estimates. At most, they show that individual appellees had arrangements with certain repair shops that agreed to do repair work at the rates used by appellees' appraisers in exchange for appellees' efforts to give them volume business.[45] The cited documents do not show, or even suggest, that appellees

**42.** Liberty Mutual has explained that, based on his survey, Mr. Carr did recommend increased use of company or "staff" appraisers, a practice used by other companies he interviewed. Aside from this practice, Liberty Mutual adopted what it describes as its "unique direct appraisal system," based upon Mr. Carr's recommendation. *See* Brief for Appellee Liberty Mutual Insurance Co. at 16–18, 22. Appellants have not refuted this description of Mr. Carr's recommendations or Liberty Mutual's claims-handling system.

**43.** In one document Mr. Carr notes that appellees Allstate, Nationwide, and State Farm "develop 'referral' garages which will do work sight unseen at the prices estimated by the company appraisers involved. Allstate, because of volume, has arrangements with a number of garages which will give them a break on labor and parts prices, charging rates below the going prices." App. 312A. This document does not indicate the rates or prices used by each company's appraisers, much less that they used the same rates in writing estimates. (Indeed, appellants' deposition testimo-

ny shows that the labor rate used by appellees' appraisers differed. *See* note 59 *infra*.) It certainly provides no evidence that appellees conspired to fix the rates they used in writing estimates.

**44.** The memoranda discuss a variety of issues relating to claims handling, such as the use of "staff" or "company" appraisers as opposed to independent appraisers, training of appraisers, security problems with appraisers, the use of "competitive" or "referral" garages to do repair work, and the use of "drive-in" inspection and appraisal facilities.

**45.** Some of the Liberty Mutual "Home Office Claims" memoranda that are cited to support statements about communications between appellees concerning price-fixing, Appellants' Brief at 23–27, actually contain information about the relationships between certain appellees and repair shops. Again, the documents are not probative of the claim that appellees conspired to fix the price of automobile repair work. *See, e.g.,* note 43 *supra.*

based their damage estimates on a labor rate or formula that they had collectively agreed to use.[46] Giving appellants the benefit of any inferences reasonably to be drawn from the documents, they suggest, *at most*, parallel business behavior which would be in the economic self-interest of each appellee. Any automobile insurance company concerned about its costs would benefit from establishing relationships with repair shops that agreed to do volume work at low rates. A price-fixing agreement therefore cannot reasonably be inferred from the existence of such vertical arrangements, especially when the alleged vertical arrangements varied in detail.

Similarly, appellants refer to documents showing that certain appellees, specifically State Farm and Travelers, conducted surveys of the facilities and services offered and the rates charged by repair shops in particular geographic areas. *See* Appellants' Brief at 31–32; App. 170A, 193A–280A. The documents contain no suggestion of collaboration in conducting the surveys (particularly since the Travelers' document is dated October 9, 1968, while the State Farm survey documents are from 1973–74).[47] Conducting a survey to determine the rates charged by repair shops is a logical way for an insurance company to determine the appropriate rate to use in estimating damage claims. Again, giving appellants the benefit of all reasonable inferences to be drawn from these documents, the fact that certain appellees conducted such surveys—five to six years apart—creates no inference that appellees conspired to fix the price of automobile repair work. *See Workman v. State Farm Mutual Automobile Insurance Co.*, 520 F.Supp. 610, 621 (N.D.Cal.1981).

(b) *Evidence Cited by Appellants in Opposition to the Renewed Motions for Summary Judgment Below*

We have also carefully reviewed appellants' memorandum to the District Court in opposition to the renewed motions for sum-

---

**46.** Appellants rely heavily on certain statements in a Liberty Mutual memorandum to its claims personnel containing numerous recommendations for reducing claims costs. Appellants' Brief at 27; App. 375A–84A. The statements on which appellants rely are found in one paragraph in this memorandum. Discussing the use of appraisers in small offices, the memorandum states:

> If you have any concern about the quality or quantity of back-up garages which will support your appraisers, check with competitors, as some of our offices have done, to get leads as to other qualified garages which are likely to be willing to serve us in the back-up capacity. Try the other big companies such as Nationwide, Allstate and State Farm.

App. 378A. This paragraph does suggest that there have been some communications between certain appellees about the use of specific garages. Reading the document in the light most favorable to appellants, it is possible to infer that "back-up garages" refers to garages willing to do work at rates that were acceptable to Liberty Mutual. It does not, however, infer that Liberty Mutual had agreed with other insurers on either acceptable rates or acceptable repair shops, or that the insurers even used the same cost formula or processing procedures for claims adjustment.

These lone two sentences, probably the most probative evidence presented by appellants after years of discovery, surely do not require submission of appellants' price-fixing claim to a jury. Assuming Liberty Mutual in fact sought information on back-up garages from the other appellees, there is no indication in the document of how the other appellees responded. Nor is there any suggestion that appellees acted collusively *vis a vis* repair shops; if anything, the recommendation that Liberty Mutual office get "leads" about repair shops suggests that they obtained information which they then pursued independently. Moreover, that Liberty Mutual sought leads from other appellees about garages that would "support [their] appraisers" does not suggest that appellees' appraisers wrote at the same rates. (Indeed, appellants' 1972 deposition testimony states that appellees used different hourly labor rates in writing estimates. *See* note 59 *infra*.) Viewed in conjunction with the other evidence presented by appellants, and drawing all reasonable inferences in appellants' favor, this document simply does not provide that additional quantum of evidence from which a rational jury could conclude that appellants conspired to fix the price of automobile damage repair work.

**47.** The State Farm documents show that, based on a survey of labor rates charged by repair shops, State Farm raised the labor rate it used in most of the areas surveyed. App. 194A. The Travelers' document appears to be a request for information from a local office concerning the average labor rate charged by local repair shops. App. 170A.

mary judgment and their accompanying statement of genuine issues for trial.[48]  *See* Plaintiffs' Statement of Genuine Issues To Be Litigated, and Plaintiffs' Memorandum, Record, vol. 11, entry nos. 311, 312.  The factual allegations in appellants' memorandum and statement of issues are virtually the same as those in their brief on appeal, and much (but not all) of the record evidence cited in support of those allegations is cited in their brief as well.  After considering—in the light most favorable to appellants—the documents cited by appellants below but not on appeal, we conclude that this additional evidence could not reasonably be read to create an inference of a horizontal price-fixing conspiracy.

Appellants cite a number of additional Liberty Mutual "Home Office Claims" memoranda to support the claim that there were communications among appellees concerning the establishment and enforcement of a prevailing labor rate for automobile damage repair work.  *See* Plaintiffs' Memorandum at 13.  The additional documents cited (*i.e.*, documents not also cited on appeal) are memoranda written by Mr. Carr on the basis of his interviews with five insurance companies other than appellees.[49]  The memoranda discuss, *inter alia*, the claims-handling procedures of these companies and their dealings with "captive" and "backup" garages.  Liberally construed, the documents show some parallel behavior by the companies involved concerning methods of handling claims and relations with repair shops, but they show nothing more and are inadequate to raise an inference of concerted action.[50]  Certainly they cannot create an inference of conspiracy among appellees, whose practices are not even the subject of the memoranda.

Many of the documents cited below by appellants concern vertical arrangements between appellees and repair shops.  For example, some of the documents indicate that certain appellees had arrangements with "captive" or "back-up" shops that agreed to provide discounts to appellees or to do work at rates used by appellees in writing their estimates in exchange for volume referrals by appellees.[51]  Some specifi-

---

**48.**  One document, State Farm Document 100, cited by appellants for the proposition that the term "prevailing" labor rate referred to the rate set by the insurance companies, Plaintiffs' Memorandum, at 15 n.24, is not found in the record.  Appellants cite five other State Farm documents to support the same allegation, all of which we have reviewed carefully.  None provide any support for the allegation.

**49.**  Home Office Claims Memorandum of Aug. 5, 1970 (Kemper Insurance);  Home Office Claims Memorandum of Aug. 20, 1970 (Farmers Insurance Group);  Home Office Claims Memorandum of Aug. 21, 1970 (Central National Insurance Company of Omaha);  Home Office Claims Memorandum of Aug. 25, 1970 (Universal Underwriters);  Home Office Claims Memorandum of Aug. 25, 1970 (Foremost Insurance Company) filed with Plaintiffs' Memorandum in Opposition to Defendants' Renewed Motions for Summary Judgment, Record, vol. 11, entry no. 312.

**50.**  The August 21, 1970 memorandum concerning Central National Insurance Company of Omaha contains some references to communications between insurance companies, which are innocuous for purposes of this suit.  A representative of Central suggests, for example, that "the insurance industry . . . get together and arrange to have [a type of frame-straightening machine] spotted around the country at convenient locations . . . [to] reduce the cost of repairs."  Home Office Claims Memorandum of August 21, 1970, at 2.  There is no suggestion in the memorandum that any of the appellees were involved in such a plan.  It also notes that Central took part in a series of "round-table discussions" with representatives of several insurance companies on "subjects of general interest."  *Id.* at 3.  None of the appellees, however, were among the companies listed.  Finally, Central recommended to Liberty Mutual two independent appraisal services.  *Id.* at 2.  The memorandum, however, reflects no discussion of rates or formulas used by these appraisers or by any of the appellees.

**51.**  *See* Allstate Documents 179, 568, Nationwide Document 387, Liberty Mutual Documents IV–3, 10, 26, Plaintiffs' Answer to Defendants' Motions for Summary Judgment Based on the McCarran-Ferguson Act, filed June 16, 1975, App., vol. I, Record, entry no. 269 [hereinafter cited as "Plaintiffs' App., vol. I"];  State Farm Document 1035, Plaintiffs' Answer to Defendants' Motions for Summary Judgment Based on the McCarran-Ferguson Act, filed June 16, 1975, App., vol. II, Record, entry no. 269 [hereinafter cited as "Plaintiffs' App., vol. II"].

Allstate Document 179 is cited for a number of propositions in appellants' memorandum in

cally concern efforts by certain appellees to resist increases in the labor rate charged by repair shops.[52] As with the documents cited in appellants' brief concerning appellees' vertical arrangements with repair shops, these documents do not contain evidence of a horizontal price-fixing conspiracy. Indeed, some of the documents directly contradict appellants' claim that appellees conspired to fix the labor rate for repair work.[53] Nor do the documents cited support an inference of concerted action by appellees in dealing with repair shops. They discuss the dealings of individual appellees with repair shops. These may be similar but, as noted above, parallel action is not enough to create an inference of conspiracy or agreement.

> opposition to the renewed motions for summary judgment. *See* Plaintiffs' Memorandum at 15 ns. 23, 25; 16 ns. 28, 32; 18 n.34; 19 n.35. This document reviews the history of Allstate's relations with auto body shops in the Philadelphia area. It notes that its relations were strained in the late 1960s when the prevailing rate increased from six dollars per hour to seven dollars per hour. Allstate resisted this increase while other insurance companies did not. Its relations with repair shops improved, the document indicates, when Allstate went to seven dollars per hour in 1969. This document provides no evidence that Allstate conspired with the other appellees to fix the labor rate.

**52.** *See* Nationwide Document 357, Liberty Mutual Documents 38, 42, 46, Plaintiffs' App., vol. I; State Farm Document 535, Plaintiffs' App., vol. II.

**53.** For example, State Farm Document 767, Plaintiffs' App., vol. II, is a memorandum about State Farm's response to a repair shop that complained that the labor rate used by State Farm was too low. The memorandum states:

> I commented to him that I felt this was putting the cart before the horse, as it should be the shops that set the labor rates and not the insurance companies. I told him I have only repeated what we have said to him many times before, we as a company do not set labor rates, we merely abide by the competitive labor rate in the area, and until such time as all or a substantial majority of the shops are charging a higher labor rate we will continue to work on the lower competitive figure.

> *See also* Liberty Mutual Document 47, Plaintiffs' App., vol. I (Liberty Mutual maintained its rate of $9 per hour even though "most insurance companies allegedly are writing at more than $9 per hour").

A number of documents record the efforts of some of the appellees to determine the prevailing rate charged by repair shops or to predict increases in that rate, generally by conducting surveys of the shops in a particular area.[54] Again, this group of documents does not reflect any concerted action, only parallel action in the self-interest of each of the appellees.

Several documents cited by appellants provide additional evidence of communications among the insurance companies. It is clear from our review that the communications between appellees reflected in these documents do not pertain to the rates appellees used in writing damage estimates and do not provide support for appellants' horizontal claim.[55]

**54.** *See* State Farm Documents 249, 930, Plaintiffs' App., vol. II; Nationwide Document 676, Plaintiffs' App., vol. I.

**55.** For example, one document discusses a meeting in 1969 between representatives of several insurance companies, including appellees Travelers and Nationwide, concerning automobile repair costs. Travelers Document 290, Plaintiffs' App., vol. I. The document notes the general feeling of those present that repair costs were not excessive but were likely to rise in the future. It also notes a discussion about the problem of unskilled workers in the auto repair business and the predominance of small, inefficient repair shops. Finally, it discusses an experimental repair shop owned by Travelers and notes that larger and more effective shops require a large capital investment. Another document concerns Nationwide's efforts to estimate the price of labor and parts for 1969. It notes that Nationwide was watching the experimental garage owned by Travelers and that the Travelers "manager" had told Nationwide that a labor rate of $7.50 an hour was unprofitable. Nationwide Document 676, Plaintiffs' App., vol. I. Certain State Farm documents indicate that State Farm received from Nationwide a copy of Nationwide's "Claims Performance Evaluation Guidelines," but they contain no indication that the "Guidelines" in any way pertained to the prices charged by repair shops or used by Nationwide in writing estimates. State Farm Documents 988–99, Plaintiffs' App., vol. II. Another State Farm document discusses Allstate's system of "drive-in" garages, and states that the system has been discussed with Allstate's management. The memorandum also states, however, that State Farm was opposed to adopting any arrangements similar to the system used by All-

Appellants cite portions of the deposition of Curtis J. Knotts, the owner of an automobile body repair shop, to support the allegation that "[t]he 'prevailing' rate was the 'going rate' fixed by the insurance companies." Plaintiffs' Memorandum at 14 & n.21.[56] In one of the cited portions, Mr. Knotts explains that if his labor rate had been "higher than the other competitive garages around [him]," he would have lost some of the insurance companies' business. Testimony that insurance companies paid only the competitive market rate, however, is not evidence that they "fixed" that rate by agreement or conspiracy. Mr. Knotts states that he determines his labor rate by "look[ing] at the net profit at the end of the year ... prices on the materials, the overhead and so forth," and that if the resulting rate was above the going rate, his shop was "in trouble."[57] If he was unable to do work at the rates used by an insurance company, he would send a letter to the company stating that he had increased his rates, possibly after discussing the intended increase with insurance company estimators or adjustors. Knotts Tr. at 25–26, Record, entry no. 227. If anything, Mr. Knotts' statements show that, subject to the constraints of his competitors' rates, he set the labor rate for his shop, not the insurance companies.[58] In the other cited portion of the deposition, Mr. Knotts states that in 1972 the five appellees used the same labor rate in writing appraisals for work done in his shop, that they varied in the rates they

used in 1973, and that their rates were the same in 1974. Id. at 31–32. This testimony indicates at most that appellees often used the same labor rate in writing their estimates for a particular repair shop, a factor which, as noted before, does not itself create an inference of conspiracy, and that they used the going rate in a particular area in writing their estimates. It does not even suggest that the going rate was established by agreement among appellees. A price-fixing conspiracy can hardly be inferred from the cited portions of Mr. Knotts' testimony.

(c) *Self-Serving Statements and Conclusory Allegations in Appellants' Affidavits*

Finally, the affidavits submitted by three of the appellants in support of their opposition to the renewed motions for summary judgment do not further their cause. Rule 56(e) of the Federal Rules of Civil Procedure requires that "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." When a motion for summary judgment is made and properly supported, the opposing party's affidavits or other documents "must set forth specific facts showing that there is a genuine issue for trial." Id. The conclusory allegations in appel-

---

state. State Farm Document 1026, Plaintiffs' App., vol. II. Finally, appellants also cite a memorandum about a meeting between representatives of Travelers and Allstate that discusses part of Allstate's organizational structure and its training program for claims personnel. The memorandum contains no discussion of automobile repair work or estimates. Travelers Document 79, Plaintiffs' App., vol. I.

**56.** Appellants also cite portions of the deposition of Al Spina, also an owner of a repair shop, to support the same allegation. Plaintiffs' Memorandum at 14 n.21. As already noted, however, the Spina deposition is not in the record. *See* note 40 *supra.*

**57.** It is a fact of economic life that a firm which is required to set a price higher than the market price in order to recover its various costs

and return a reasonable profit to the owners may be "in trouble." Such firms often are inefficient in the economic sense, and the process of market competition—a process protected by the Sherman Act—requires that such firms either become more efficient or be driven out of business.

**58.** Other portions of the Knotts deposition, not cited by appellants, indicate that when the repair shop's labor rate exceeded the rate used by the insurance company in writing the estimate, the company *paid the shop's rate. See* Knotts Tr. at 16 ("[I]f you got an estimate come in there, say, from State Farm that's $8 an hour, you inform them that we're at $9 an hour then they make the difference up. In other words, they pay the $9.").

lants' affidavits do not meet these requirements.

The following statement, for example, offered by each of the affiants, merely repeats in conclusory fashion appellants' basic claim: "During the relevant period of time, the insurance companies fixed a uniform labor rate which they agreed to pay on automobile damage repairs. That rate was termed by the insurance companies the 'prevailing' rate." Affidavits of Richard T. Hogg, William W. Cumming, Jr., and Phillip M. Proctor, Record, vol. 11, entry no. 312, Exhibits 1–3. Moreover, this allegation contradicts the earlier deposition testimony of all three appellants.[59] That this allegation (as well as most of the other allegations in the affidavits) is worded identically in each of the three affidavits further detracts from its credibility. The District Court properly placed little value in these affidavits because it found them "self serving" and "at sharp variance with [the] prior testimony [of the three appellants]." *Proctor II*, [1980–81] Trade Cases (CCH) ¶ 63,591 at 77,141 n.6.

### 4. *Summary of Evidence and Findings*

In summary, the record evidence marshalled by appellants to show that their claim of a horizontal price-fixing conspiracy should go to a jury falls far short of that goal. The evidence of communications or meetings between appellees provides no support for their claim, in some instances because the meetings or conversations did not involve appellees, in others because the record simply reveals no communications about the rates charged for automobile body repair work or the rates used by appellees in writing damage estimates. Appellants have pointed to no direct evidence to support their allegations that appellees met and agreed to establish a uniform labor rate or otherwise to fix the price of automobile body repair work.

There is some evidence of parallel behavior by appellees. Construing this evidence in the light most favorable to appellants, it suggests that *upon occasion* certain appellees used the same labor rate in writing estimates, that they had similar arrangements with repair shops that agreed to do volume work at the low rates used in their estimates, that they conducted surveys of repair shops to determine the average rate charged by shops in particular areas, and that they tended to resist price increases by repair shops. However, these alleged parallel practices, without more, cannot• create an inference of conspiracy among appellees where, as here, the practices are in the economic self-interest of each of the individual appellees. The practices are as consistent with independent as with concerted actions. Unless an insurance company is willing to pay whatever price is charged at any given repair shop, it stands to reason that it would conduct surveys to determine the rates charged by repair shops. It is equally understandable that a company would, in an effort to control costs, resist price increases and write estimates using the lowest rates acceptable to a sufficient number of quality garages. It also makes economic sense for an insurance company to make arrangements with certain repair shops that agree to do work at the rates used by the company in writing estimates in exchange for volume referrals by the company. We agree with Chief Judge Peckham's conclusion in *Workman v. State Farm Mutual Automobile Insurance Co.*, 520 F.Supp. 610, 621 (N.D.Cal.1981):

In essence it appears to this court that the parallel business practices against which plaintiffs here inveigh have as their obvious objective the reduction of costs which the defendant insurance companies incur in fulfilling their contractual

**59.** In their earlier deposition testimony, appellants state that there was some variation in the labor rates used by appellees, generally a variation of one dollar an hour. *See* Proctor Tr. at 127–128, 181, 780–81, Record, entry no. 288; Hogg Tr. at 665–66, 704, Record, entry no. 291. Their deposition testimony also indicates that appellants themselves set their hourly labor rates, taking into account factors such as their costs and the going rate among other repair shops in their area. *See* Proctor Tr. at 744; Hogg Tr. at 702–03; Cumming Tr. at 251–52, Record, entry no. 289.

obligations to their insureds. Such conduct is in the economic self-interest of each individual insurance company and would redound to their benefit regardless of whether other companies chose to act similarly.

In short, none of these practices create an inference that appellees were acting pursuant to agreement or conspiracy.

We realize that summary judgment should not be granted hastily in complex antitrust actions. *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). As the Supreme Court has stated, however:

> While we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring that anyone who files an antitrust complaint setting forth a valid cause of action be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint.

*First National Bank v. Cities Service Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968). The protracted nature of this litigation, appellants' extensive opportunities for discovery and their willingness to rely on evidence already before the court,[60] add to our conviction that summary judgment is proper in this case. In affirming a grant of summary judgment in an antitrust action, this court has stated:

> In considering whether to grant summary judgment in this case the District Court relied ... on the length of time (nearly six years) and the "ample opportunities" for discovery that appellants had "to unearth evidence to support their allegations." We also find these factors relevant to our determination of the propriety of affirming summary judgment in this case.

*Merit Motors, Inc. v. Chrysler Corp.*, 569 F.2d 666, 669 (D.C.Cir.1977) (footnote omitted); *accord, Weit v. Continental Illinois National Bank & Trust Co.*, 641 F.2d 457,

464 (7th Cir. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 1610, 71 L.Ed.2d 847 (1982) (where parties have had "eight years of unlimited discovery ... [and] have designated the evidence on which they will rely at trial, and the Court has had an opportunity to review the evidence and concludes that no reasonable jury could return a verdict for plaintiffs, judicial economy mandates that summary judgment be entered"). Based on the evidence presented by appellants and the circumstances of this case, we conclude that granting summary judgment to appellees on appellants' horizontal price-fixing claim is proper.

## IV.  APPELLANTS' CLAIM OF VERTICAL RESTRAINTS OF TRADE

Appellants claim that appellees implemented their alleged conspiracy to fix the price of automobile body repair work by entering into vertical arrangements with certain "preferred," or "captive" or "back-up" repair shops that agreed in advance to do repair work at prices fixed by appellees, generally in exchange for assurances that appellees would refer business to them. Appellants have not presented evidence of written contractual agreements between any of the appellees and repair shops, and appellees have denied having agreements with repair shops concerning the price of repair work. Our task in reviewing a grant of summary judgment is not, however, to decide disputed issues of fact, but to decide whether genuine issues of material fact remain. Thus, as we did in reviewing appellants' horizontal claim, we must accept appellants' allegations, despite appellees' denials, to the extent that there is evidentiary support for them. The documentary evidence cited by appellants, construed in their favor, does support the contention that appellees, *acting individually*, have at times had arrangements with repair shops that agreed to do work at reduced rates or at the rates used by the individual appellee involved, sometimes in exchange for referral

**60.**  *See* Appellants' Brief at 22, 35.

of volume business.[61] We therefore accept the existence of such individual arrangements in deciding whether the District Court's grant of summary judgment on appellants' vertical claim was proper. Given our disposition of appellants' horizontal claim, however, we do not accept their assertion that any of the appellees entered vertical arrangements pursuant to, or in furtherance of, a horizontal price-fixing conspiracy. Our analysis of the vertical arrangements follows from these two premises.

**A.   Whether the Alleged Vertical Arrangements Constitute the "Business of Insurance" Under the McCarran Act**

The District Court in this case concluded that the alleged vertical arrangements between appellees and repair shops were distinguishable from the pharmacy agreements in *Royal Drug* and that *Royal Drug* therefore did not disturb the prior ruling of the Court of Appeals that these arrangements constituted the "business of insurance." We disagree.

■ The Court in *Royal Drug* emphasized that the pharmacy agreements under consideration were for the purchase of goods and services outside the insurance industry. The same is true of the alleged vertical arrangements in this case. That the pharmacy agreements were in writing, unlike the vertical arrangements in this case, does not make *Royal Drug* any less controlling.[62] Our reasons for distinguishing *Royal Drug* from the alleged horizontal agreement in this case, and concluding that the alleged agreement in this case consti-

tutes the "business of insurance" even under *Royal Drug's* analysis, see Part III.A.2. *supra*, simply do not apply to the alleged vertical arrangements. We conclude that the vertical arrangements are not the "business of insurance" and therefore are not immune from the antitrust laws under the McCarran Act.

The decisions of other courts that have considered this question support our conclusion. In *Quality Auto Body, Inc. v. Allstate Insurance Co.*, 660 F.2d 1195 (7th Cir. 1981), the Seventh Circuit addressed claims of automobile body repair shops virtually identical to appellants' claims in this case. Although it found that the alleged horizontal price-fixing agreement constituted the "business of insurance" under the McCarran Act, *id.* at 1201 & n.4, it concluded that the vertical arrangements between insurers and "preferred" repair shops did not. *Id.* at 1201–02. Similarly, in *Workman v. State Farm Mutual Automobile Insurance Co.*, 520 F.Supp. 610 (N.D.Cal.1981), which also involved claims similar to those in this case, the court found the alleged horizontal price-fixing agreement immune under the McCarran Act, *id.* at 615–16 n.7, but made no such finding with respect to the alleged vertical conspiracy between insurers and "captive" repair shops. *Id.* at 624–25.

The Solicitor General's brief for the United States as amicus curiae in *Royal Drug* drew the same distinction. Analyzing the Court of Appeals decision in *Proctor*, it argued that the horizontal agreement in *Proctor* should be viewed as the "business of insurance," while the alleged vertical ar-

---

**61.** *See* notes 45–46, 50–53 *supra* and accompanying text.

**62.** The District Court stated:

In *Proctor*, there were no written agreements as in *Royal Drug*. These written agreements have no counterparts in the automobile insurance industry. There was no demonstration that such agreements existed between insurers and the innumerable auto repair shops where insureds can and do go for repairs. There has been no showing that insureds offered to enter into such arrangements with "preferred" repair shops. The factual situation in *Proctor* is so completely

different from that in *Royal Drug* that the finding in the latter should not be regarded as controlling.
*Proctor II*, [1980–81] Trade Cases (CCH) ¶ 63,-591 at 77,140. We do not find the District Court's distinctions persuasive. Indeed, the prior ruling of the Court of Appeals in *Proctor*, that the vertical arrangements constituted the "business of insurance," was cited by the Supreme Court in *Royal Drug* as one of the conflicting circuit court decisions that provided the basis for the grant of certiorari in *Royal Drug*. *Royal Drug*, 440 U.S. at 208–09 n.2, 99 S.Ct. at 1071–72 n.2; *see* note 25 *supra*.

rangements should not. Brief for the United States as Amicus Curiae at 31–32, *Group Life & Health Insurance Co. v. Royal Drug Co.*, 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979), *reprinted in* Defendants' Supp. App. 43–44. The Antitrust Division of the Department of Justice has recently reiterated that position. In a memorandum submitted for the United States as amicus curiae in an ongoing suit brought by automobile repair shops against automobile insurers, it concludes that agreements between individual insurers and repair shops concerning the price of repairs do not constitute the "business of insurance" under *Royal Drug.* Memorandum for the United States as Amicus Curiae at 5–7, *D&B Auto Body, Inc. v. Allstate Insurance Co.*, No. 79–0550 (D.R.I.). By contrast, it concludes that an agreement among insurers to reimburse insureds only for the prevailing cost of repair would be immune under the McCarran Act. *Id.* at 21. *See* note 28 *supra.*

Because we cannot accept the District Court's conclusion that the alleged vertical arrangements are immune from the antitrust laws under the McCarran Act, we proceed to consider its alternative holding— that the alleged arrangements do not violate the antitrust laws.

B. *The Legality of the Alleged Vertical Arrangements*

In evaluating the legality of the alleged vertical arrangements between appellees and certain repair shops, we must bear in mind not only what appellants have alleged but also what they have not alleged. Appellants do not allege that appellees' insureds were required to use "preferred" or "captive" shops for repair work, or that appellees orchestrated a boycott of other repair shops. Indeed, appellants admittedly have done repair work for appellees' insureds. Nor is there any allegation that repair shops that allegedly entered agreements with appellees were coerced to do so or that those shops were contractually barred from raising their rates. On the contrary, the documentary evidence presented by appellants shows that these shops apparently did raise their rates, despite resistance by appellees. Nonetheless, for purposes of our review we assume that the so-called "preferred" shops agreed not to raise the rates they charged the appellees with whom they had entered into agreements.

Reduced to their essence, the alleged vertical arrangements are "agreements . . . between buyers (the insurance companies) with apparently extensive market power and sellers (the body shops) with what, in comparison, seems slight market power." *Quality Auto Body, Inc. v. Allstate Insurance Co.*, 660 F.2d 1195, 1203 (7th Cir. 1981). (Appellants repeatedly state in their brief that this case involves appellees' purchase of goods and services from repair shops.) Notably, appellants have not challenged the District Court's holding that these alleged agreements by themselves do not violate the antitrust laws. Nor could they persuasively make such an argument.

It is a settled principle that an agreement "fixing" the price of goods or services between the contracting parties themselves is to be assessed under the "rule of reason," not the *per se* rule. *Quality Auto Body*, 660 F.2d at 1203; *Sitkin Smelting & Refining Co. v. FMC Corp.*, 575 F.2d 440, 446 (3d Cir.), *cert. denied*, 439 U.S. 866, 99 S.Ct. 191, 58 L.Ed.2d 176 (1978); *Travelers Insurance Co. v. Blue Cross*, 481 F.2d 80, 84 (3d Cir.), *cert. denied*, 414 U.S. 1093, 94 S.Ct. 724, 38 L.Ed.2d 550 (1973); *Sausalito Pharmacy, Inc. v. Blue Shield*, [1981–1] Trade Cases (CCH) ¶ 63,885, at 75,607 (N.D. Cal.1981); *Sausalito Pharmacy, Inc. v. Blue Shield*, [1980–81] Trade Cases (CCH) ¶ 63,-695, at 77,724–25 (N.D.Cal.1980). Without more, such an agreement does not unreasonably restrain trade within the meaning of section 1 of the Sherman Act. *See Quality Auto Body*, 660 F.2d at 1202–05; *Travelers Insurance Co. v. Blue Cross*, 481 F.2d at 84; *Nationwide Mutual Insurance Co. v. Automotive Service Councils of Delaware, Inc.*, [1981–1] Trade Cases (CCH) ¶ 63,958, at 75,962 (D.Del.1981); *Knuth v. Erie-Crawford Dairy Cooperative Association*, 326

F.Supp. 48, 53 (W.D.Pa.1971), *rev'd in part on different grounds*, 463 F.2d 470 (3d Cir. 1972), *cert. denied*, 410 U.S. 913, 93 S.Ct. 966, 35 L.Ed.2d 278 (1973). The informal vertical agreements alleged in this case represent the effort of individual appellees to secure the services of automobile body repair shops at the lowest possible cost and on the terms most advantageous to them. That such agreements are not anticompetitive in purpose or effect is "in accord with the longstanding antitrust principle that Section 1 of the Sherman Act does not preclude a party from unilaterally determining the parties with whom it will deal and the terms on which it will transact business. *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). This is true even where, as here, the buyers are big and the sellers are comparatively small." *Quality Auto Body*, 660 F.2d at 1205. Appellees may well have been able to secure volume discounts and similar advantages from certain repair shops; however, the Sherman Act was not designed to disallow discounts or other preferential treatment for volume customers.[63]

■ Courts that have considered antitrust challenges to the type of vertical agreements alleged in this case, *i.e.*, agree-

ments between insurers and automobile repair shops concerning the price of repairs, have found no violation of the antitrust laws. *E.g., Quality Auto Body*, 660 F.2d at 1201–05; *Workman v. State Farm*, 520 F.Supp. at 624–25; *cf. Chick's Auto Body v. State Farm Mutual Automobile Insurance Co.*, 168 N.J.Super. 68, 401 A.2d 722 (Super. Ct.Law Div.1979), *aff'd per curiam*, 176 N.J. Super. 320, 423 A.2d 311 (Super.Ct.App.Div. 1980) (rejecting claim under New Jersey antitrust law[64] of price-fixing and boycotting by automobile insurers).[65]

We offer no opinion on whether the alleged vertical arrangements would be unlawful if they were used to implement an unlawful horizontal agreement or conspiracy in restraint of trade.[66] We have already concluded that appellants have not presented factual support for their claim of a horizontal price-fixing conspiracy sufficient to withstand a motion for summary judgment against them. We have also concluded that the alleged horizontal agreement is immune under the McCarran Act from antitrust attack. It follows from our disposition of appellants' horizontal claim that the alleged vertical arrangements were not employed to further or implement an

---

**63.** It may be true that appellants had to lower their rates to the level charged by shops that had entered into agreements with one or more of the appellees or face the prospect of losing some of appellees' business to those shops. Appellants have not alleged, however, that appellees had any intentions of boycotting non-"preferred" repair shops or that any of the appellees limited the number of "preferred" shops they used. *See* Appellants' Brief at 33. Although appellants may have had to lower their rates, this is an injury stemming from competition among repair shops to obtain business from automobile insurers. "The antitrust laws, however, were enacted for 'the protection of *competition*, not *competitors*.' " *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962)).

**64.** The New Jersey antitrust statute has been construed to prohibit the same conduct prohibited by federal antitrust law. *Clairol, Inc. v. Cosmetics Plus*, 130 N.J.Super. 81, 325 A.2d 505 (Super.Ct.Ch.Div.1974).

**65.** Our decision is also consistent with the position of the Solicitor General and the Antitrust Division of the Department of Justice. *See* Brief for the United States as Amicus Curiae at 11, 32–33, *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979), *reprinted in* Defendants' Supp.App. 23, 44–45; Memorandum for the United States as Amicus Curiae at 7–10, *D&B Auto Body, Inc. v. Allstate Ins. Co.*, No. 79–0550 (D.R.I.) ("[A]n agreement between an insurance company and an automobile repair shop establishing the price at which the repair shop will repair policyholders' automobiles ... does not violate the antitrust laws, absent a further showing of anticompetitive purpose or effect.").

**66.** We also offer no opinion on whether a horizontal agreement to enter into vertical arrangements with "captive" repair shops would be immunized under the McCarran Act. Appellants have not contended that the horizontal agreement they allege extended beyond an attempt to set a prevailing rate.

unlawful horizontal combination or conspiracy. Therefore, we conclude only that, in the context of this case, the District Court's decision that the vertical arrangements did not violate the antitrust laws is correct and that its grant of summary judgment on this issue must be affirmed.

## V. CONCLUSION

We affirm the District Court's decision to grant summary judgment to appellees, although our reasoning differs from the District Court's on certain issues. We conclude that, despite the current uncertainty about the nature and scope of the McCarran Act's "business of insurance" exemption from the antitrust laws, the horizontal price-fixing agreement alleged by appellants falls within that exemption. We also find that summary judgment on this claim was proper for a second reason. After carefully reviewing the evidence cited by appellants in support of their price-fixing claim, we conclude that they have failed to produce evidence to raise a genuine issue of material fact sufficient to defeat summary judgment on this claim. Finally, although we cannot accept the District Court's conclusion that the alleged vertical arrangements between appellees and certain repair shops are the "business of insurance" under the McCarran Act, we agree with its alternative holding that summary judgment in favor of appellees was proper because these arrangements do not violate section 1 of the Sherman Act.

*So ordered.*

J. SKELLY WRIGHT, Circuit Judge, dissenting:

Ten years ago appellants filed suit claiming violations of the federal antitrust laws.[1]

Appellee insurance companies [2] had allegedly combined and conspired among themselves to fix the hourly labor rate to be paid automobile body repair shops such as the appellants. In addition, the insurance companies had allegedly implemented this "horizontal" (intra-industry) agreement by entering into "vertical" (inter-industry) agreements with certain preferred repair shops that agreed to work at the rates prescribed by appellees.

In 1975 the District Court granted summary judgment to the insurance companies after concluding that their activities were exempt from antitrust laws since they constituted the "business of insurance" under the McCarran-Ferguson Act.[3] *Proctor v. State Farm Mutual Auto. Ins. Co.*, 406 F.Supp. 27 (D.D.C.1975). This court affirmed, 561 F.2d 262 (D.C.Cir.1977), over my dissent, *id.* at 276. In 1979 the Supreme Court vacated the judgment of this court and remanded the case for further consideration in light of *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979) (hereafter *Royal Drug* ).[4]

On remand the District Court granted another summary judgment for the insurance companies after finding once again that the alleged horizontal and vertical agreements were exempt from antitrust scrutiny.[5] In the opinion of the District Court, *Royal Drug* had left "untouched and intact" [6] the vacated Court of Appeals judgment. The majority affirms the District Court's grant of summary judgment, although it relies in part on different grounds.

At the outset, the majority agrees with the lower court that, *even after Royal*

1. In particular, § 1 et seq. of the Sherman Act, 15 U.S.C. § 1 et seq. (1976).

2. The five appellees—State Farm Mutual Automobile Insurance Co., Liberty Mutual Insurance Co., Nationwide Mutual Insurance Co., Allstate Insurance Co., and Travelers Indemnity Co.—are among the largest automobile insurers in the United States.

3. 15 U.S.C. § 1012(b)(1976) (hereafter referred to as the McCarran Act).

4. *Proctor v. State Farm Mutual Auto. Ins. Co.*, 440 U.S. 942, 99 S.Ct. 1417, 59 L.Ed.2d 631 (1979).

5. *Proctor v. State Farm Mutual Auto. Ins. Co.*, [1980–81] Trade Cases (CCH) ¶ 63,591 (D.D.C. Oct. 12, 1980). In the alternative the court found the vertical agreements legal. *Id.* at 77,-140.

6. *Id.* (discussing the horizontal agreement); *see also id.* (finding *Royal Drug* was not controlling as to the vertical agreements).

*Drug,* the alleged horizontal price-fixing agreement is the "business of insurance." At 318–325. Insurance companies can therefore legally conspire among themselves to fix labor rates in the automobile repair industry, and summary judgment is justified as a matter of law. In the alternative, the majority affirms the grant of summary judgment on different grounds. It conducts "an independent review"[7] of the entire record and finds no evidentiary support for the alleged horizontal agreement, *id.* at 325–326, even though this issue was *never* addressed by the District Court.[8] As for the vertical agreements between the insurers and certain repair shops, the majority properly rejects the District Court's finding that they constitute the "business of insurance." *Id.* at 336–337. Nonetheless, the majority finds the agreements legal under a "rule of reason" analysis, *id.* at 337–338, although it does not decide whether they would be lawful if used to implement an illegal horizontal agreement, *id.* at 338.

I respectfully dissent on three main grounds. First, in my view an agreement among insurers to fix labor rates of automobile repairers is not the "business of insurance." Under *Royal Drug* the alleged horizontal agreement simply does not constitute the business of insurance. *See* Part I *infra.* Second, the majority's attempt, in the alternative, to grant summary judgment on the horizontal agreement issue based on its own review of the record is, in my judgment, misguided. *See* Part II *infra.* Finally, since the vertical agreements were designed to implement an unlawful horizontal agreement, the vertical agreements themselves were illegal. *See* Part III *infra.*

## I. THE HORIZONTAL AGREEMENT IS NOT THE "BUSINESS OF INSURANCE"

Appellants have alleged that the insurance companies exchanged data relating to,

and also agreed upon, a "prevailing" labor rate at which to pay repair costs of automobile damage claims.[9] According to the majority, such actions are the "business of insurance" even after *Royal Drug.* In my view, these activities do not constitute the business of insurance under the McCarran Act. Analysis of *Royal Drug* and the legislative history of the antitrust exemption clearly warrants this conclusion.

### A. The "Business of Insurance"

In *Royal Drug* the Supreme Court explained in some detail the meaning of the term "business of insurance." The Court emphasized that "spreading of risk"—and not mere risk reduction—was an "indispensable" characteristic of insurance. 440 U.S. at 212, 214–215, 99 S.Ct. at 1073, 1074–75. Since agreements with third-party providers to reduce an insurer's expenses merely cut costs and did not spread risk, the Court concluded that the agreements did not constitute the "business of insurance" even though they were the "business of insurance companies." *Id.* at 217, 232–233, 99 S.Ct. at 1076, 1083–84.

*Royal Drug* indisputably narrowed the range of activities exempt from antitrust scrutiny. As the Second Circuit recently held, the exemption for the business of insurance after *Royal Drug* "is to be strictly limited to only the quintessential insurance functions." *Pireno v. New York State Chiropractic Ass'n,* 650 F.2d 387, 392 (2d Cir. 1981), *cert. granted,* —— U.S. ——, 102 S.Ct. 595, 70 L.Ed.2d 587 (1981). Even the majority concedes that a literal reading of *Royal Drug* might exclude "almost every practice outside of the basic insurance contract itself * * *." At 319. This reading seems compelled by the Court's analysis. *See* Note, 80 Colum.L. Rev. 1473, 1479 (1980); Sullivan & Wiley, *Recent Antitrust Developments: Defining*

---

**7.** *Id.* at 325 n.37.

**8.** *Id.* at 325 (issue "not reached" by District Court).

**9.** Brief for appellants at 5–6.

the Scope of Exemptions, Expanding Coverage, and Refining the Rule of Reason, 27 UCLA L.Rev. 265, 282–283 (1979).

The Supreme Court found strong confirmation for its narrow construction of the exemption in the legislative history of the McCarran Act. According to the Court, Congress understood the business of insurance to be the spreading of risk, and Congress' primary concern was to create an exemption for " 'combined efforts for statistical and rate-making purposes * * *.' " Royal Drug, 440 U.S. at 221–222, 99 S.Ct. at 1078 (emphasis by the Court; quoting Report of National Association of Insurance Commissioners, 90 Cong.Rec. A4405 (1944)). Because the legislative history bears directly on the practices alleged on appeal, it deserves special emphasis.[10]

In 1944 the National Association of Insurance Commissioners (NAIC) issued a report and proposed legislation concerning regulation of the insurance business. See 90 Cong.Rec. A4403–A4408 (1944). The views of the NAIC were deemed "particularly significant" by the Court in Royal Drug since the McCarran Act was based "in large part" on the NAIC proposal. 440 U.S. at 221, 99 S.Ct. at 1078. The foremost concern of the NAIC report was that insurance companies in fields other than life insurance[11] had great difficulty underwriting risks accurately.[12] In such fields there was "no guarantee that the contingency insured against will occur at all." 90 Cong.Rec. at A4405. Rates could only be estimated "with a lesser degree of certainty." Id. It followed that:

Since rates in these other fields are based upon the law of averages it is manifest that the broader the statistical base the more accurate the average. The experience of individual companies is seldom a

reliable guide for rate-making purposes. * * *

Id.

The NAIC report identified a secondary concern of the insurance commissioners. Other than in the life insurance field, where to sell below a proper rate was to "invite insolvency" given the certainty that people would die and claims accrue, there existed the "temptation upon the part of some underwriters to assume that the contingency insured against will not occur." Id. This raised the spectre of "inadequate rates and eventual insolvency or sharp claim practices." Id.

Based on its concerns, the NAIC report found a need for "cooperation in obtaining statistical data and in the promulgation of rates based thereon." Id. Since this result could be obtained "only through concert of action," id., Congress needed to enact an exemption from the antitrust laws.

Congressional sources expressed many of the same thoughts as the NAIC report. For example, an early House Report stated:

The theory of insurance is the distribution of risk according to hazard, experience, and the laws of averages. These factors are not within the control of the insuring companies in the sense that the producer or manufacturer may control cost factors. Obviously, these factors, in their bearing upon rates and forms of policies[,] can best be determined through cooperative action * * *. * * *

H.R.Rep.No.873, 78th Cong., 1st Sess. 8–9 (1943) (emphasis added).[13] See also S.Rep. No.1112, 78th Cong., 2d Sess. 6 (1944) (ways of safeguarding against the "untoward manifestations of nature and other vicissitudes of life" were not subject to free com-

---

**10.** This discussion draws heavily on sources cited in Royal Drug, 440 U.S. at 220–224, 99 S.Ct. at 1077–79.

**11.** The NAIC report noted that life insurance rates were based in part on mortality tables, which in turn "are based upon the certainty that everyone must die * * *." 90 Cong.Rec. at A4405. This certainty was contrasted with the uncertainty in fields such as casualty insurance. Id.

**12.** Royal Drug, 440 U.S. at 221, 99 S.Ct. at 1078.

**13.** The House Report also stressed the importance of "preserving the solvency of insuring companies" through provision of adequate rates. H.R.Rep.No. 873, 87th Cong., 1st Sess. 9 (1944).

petition) (*quoting Osborn v. Ozlin*, 310 U.S. 53, 65, 60 S.Ct. 758, 762, 84 L.Ed. 1074 (1940)).

Floor debates echoed similar themes. For instance, Representative Hancock stressed that the essence of insurance is "distribution of risk according to hazard," and that, while "insurance companies cannot control the law of averages, * * * they must reckon with them." 90 Cong.Rec. 6526 (1944). Also, members from both the Senate and the House emphasized that the new Act would exempt the activities of rating bureaus, whereby insurers pooled their loss experience in order to formulate rates. 91 Cong.Rec. 1481 (1945) (remarks of Senator Ferguson); 90 Cong.Rec. 6527 (1944) (remarks of Representative Miller of Connecticut).

### B. *The Alleged Horizontal Agreement*

The Supreme Court has deemed it "well settled" that express statutory exemptions from the antitrust laws are to be "narrowly construed." *Royal Drug*, 440 U.S. at 231, 99 S.Ct. at 1083 (citing prior cases). We should therefore only exempt those activities that clearly fall within the scope of the exemption. Here, *Royal Drug* and the legislative history of the exemption make clear that the challenged activities are not exempt from antitrust scrutiny.

To begin with, an agreement to pay repair costs using a "prevailing" labor rate manifestly does not involve spreading risk, but only risk reduction. Just like the pharmacy agreements in *Royal Drug*, the agreement as to the labor rate serves to cut the insurers' costs and thereby reduces the magnitude of the risk the insurer faces. However, the risk of automobile damages is not in any way distributed by the horizontal agreement in this case. The majority never

explains, and I fail to see, how the challenged practices meet the "indispensable characteristic"[14] of risk-spreading. Instead, the majority argues that the horizontal agreement is the business of insurance because, in its judgment, it fits within Congress' and *Royal Drug*'s understanding of statistical data-sharing and cooperative ratemaking. At 322. The majority reasons that since the costs of repair are directly related to the calculation of premiums, the challenged agreement is "virtually" a part of ratemaking and is therefore the business of insurance. *Id.* at 324.

I strongly disagree with the majority's view[15] that the alleged agreement falls within Congress' concern about exempting the sharing of statistical data and cooperative ratemaking. With respect to data-sharing, Congress worried about the insurers' ability to deal with factors (a) that were subject to hazard and the law of averages,[16] (b) that were beyond the control of the insurance companies,[17] and (c) that the insurers might be tempted to underestimate.[18] For instance, data concerning the number of accidents involving drivers in a certain age cohort definitely fall within the scope of congressional concern.[19] But data concerning the prevailing labor rate differ substantially from the statistical data that insurers were supposed to be able to share.

First, the labor rate in a given market is not a matter of random occurrence; while it is normally subject to the vagaries of the free market, it is not subject to hazard in the way that accidental events are. Second, and most important, the labor rate is *not* a factor that is beyond the control of insurance companies. Indeed, appellants allege that the insurers have actually set a prevailing labor rate. By contrast, an insurance company has no direct control over

---

**14.** *Royal Drug*, 440 U.S. at 212, 99 S.Ct. at 1073.

**15.** At 322.

**16.** *See* text at pp. 311–312 *supra*.

**17.** *See* text at p. 312 *supra*.

**18.** *See* text at pp. 311–312 & n.13 *supra*.

**19.** The frequency of accidents is obviously subject to hazard and the law of averages, is beyond the direct control of the insurance companies, and is the type of data insurers might be tempted to underestimate. Historical data concerning the average extent of damage per accident are probably analogous.

the number of accidents its insureds will have in a given year[20]; therefore, companies can legally share data involving the frequency of accidents. Third, insurers have little incentive to underestimate the labor rate in a given market, for they continually pay claims that are based on the rate. An insurer would face immediate losses if it arbitrarily assumed a labor rate below that set by the market. (On the other hand, an insurer does not face immediate losses by assuming that future contingencies such as accidents will not occur. This poses the risk of insolvency, a concern addressed by the antitrust exemption.) Thus the data-sharing envisioned by Congress in enacting the McCarran exemption differs fundamentally from the exchange of data alleged in this case.

Nor does the horizontal agreement in this case fall within the meaning of cooperative ratemaking. Ratemaking involves the setting of prices within the insurance industry itself; it does not encompass fixing prices in markets *outside* the insurance industry. For example, no one would suggest that a state authority charged with insurance ratemaking could also set labor rates in provider markets. Rating bureaus certainly have no such authority. *See, e.g.*, 7 D.C.Code §§ 35–1601 to 35–1609 (1981) (Fire Insurance Rating Bureau); 91 Cong. Rec. 1481 (1945) (remarks of Senator Ferguson) (McCarran Act exemption covered activities of D.C. rating bureau). Therefore, while the business of insurance encompasses the combined setting of rates based on pooled data involving a given set of varia-

bles, I do not see how it extends to the combined manipulation of those variables.[21]

The majority's conception of the business of insurance has pernicious implications. As long as a factor is *"directly* related to the calculation of premiums," (emphasis in original), insurers can conspire to affect it. Thus, under the majority's standard, automobile insurers can conspire and combine to fix the prices of glass, metals, and rubber used in the auto repair process, since all of these are important inputs like the labor rate. Similarly, health insurers could agree among themselves to fix the prices charged by all types of physicians for their services, since the labor rate of these individuals is analogous to that of automobile repairers. And malpractice insurers could fix the hourly legal rates of attorneys who defend their insureds. In short, under the guise of the "business of insurance," the majority would allow insurance companies to reach price-fixing agreements on an endless array of factors that affect the magnitude of the payments that insurers must make. Such an approach amounts to a stark departure from the narrow limits of the business of insurance exemption.[22]

## II. THE MAJORITY'S ERRONEOUS DECISION TO GRANT SUMMARY JUDGMENT ON THE BASIS OF THE EVIDENCE CONCERNING THE HORIZONTAL AGREEMENT

Based on its examination of apparently all of the record evidence, *see* at 327 & n.40, the majority, to secure a back-up posi-

---

**20.** Nor does an insurance company exert direct control over the actual physical damage resulting from accidents involving its insureds.

**21.** *See* Note, 80 Colum.L.Rev. 1475, 1479 (1980).

**22.** The alleged practices in this case simply bear no relationship to the concerns underlying passage of the McCarran exemption. Those concerns centered on the inability of insurance companies, especially smaller ones, to underwrite risks accurately in the absence of cooperation. *Royal Drug*, 440 U.S. at 221, 99 S.Ct. at 1078. Yet we deal in this case with enormous insurance companies that did not even engage in the alleged price-fixing agreement until 1968 or 1969. Brief for appellants at 5. For over 20

years after passage of the exemption, insurance companies accurately underwrote risks without agreeing upon the labor rates of auto repair shops. Consequently, the challenged activities hardly amount to "quintessential" insurance functions. Like the agreements in *Royal Drug*, the activities here are "legally indistinguishable from countless other business arrangements that may be made by insurance companies to keep their costs low and thereby also keep low the level of premiums charged to their policyholders." 440 U.S. at 215, 99 S.Ct. at 1075. While the horizontal agreements may be the business of insurance companies, they are definitely not the business of insurance.

tion in the event its *Royal Drug* position proves unacceptable, decides to address an issue never reached by the District Court: whether appellees have demonstrated the absence of any genuine issue of fact material to appellants' price-fixing claim. Since this issue was *not* discussed by the District Court, the issue was not properly presented for review. Thus it was not addressed directly by appellants. Instead, appellants' argument focused on whether appellees' alleged activity constituted the "business of insurance" under the McCarran Act,[23] although they naturally pointed to some of the factual support for their claims. Regardless, the majority decides to conduct its own summary judgment review of the record and thereby provide an alternative disposition of the case to which appellants have had no opportunity to respond.

### A. The Use of Trials in Antitrust Cases

The majority's efforts run counter to clear guidance from the Supreme Court concerning disposition of complex antitrust cases. While lower courts have long attempted to handle such actions without trials, these attempts have usually been rebuffed. For example, one federal judge sought to dispose of two antitrust suits by referring them to a master for resolution. The Supreme Court decisively rejected such an approach and stated:

> [M]ost litigation in the antitrust field is complex. It does not follow that antitrust litigants are not entitled to a trial before a court. On the contrary, we believe that this is an impelling reason for trial before a regular, experienced trial judge * * *. * * *

*La Buy v. Holmes Leather Co.*, 352 U.S. 249, 259, 77 S.Ct. 309, 315, 1 L.Ed.2d 290 (1957).

Similarly, lower courts have often sought to dispose of complex antitrust cases through the use of summary judgment. In *Poller v. CBS, Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), the Court strongly disapproved of resort to summary disposition.

We believe that summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot. It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised. Trial by affidavit is no substitute for trial by jury which so long has been the hallmark of "even handed justice."

*Id.* at 473, 82 S.Ct. at 491 (footnote omitted).

*Poller* established a "rigorous standard" for summary judgment. 10 C. Wright & A. Miller, Federal Practice and Procedure § 2732 at 609 (1973). Where "motive and intent play leading roles," 368 U.S. at 473, 82 S.Ct. at 491, courts should avoid summary dispositions. On the other hand, the Court has indicated that where the law is "so well developed that * * * the gist of the case turns on documentary evidence, the rule at times can be divined without a trial." *White Motor Co. v. United States*, 372 U.S. 253, 259, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963).

### B. Summary Disposition in This Case

In this appeal we confront precisely the situation where "motive and intent" play leading roles. As the majority concedes, appellants have presented "some evidence of parallel behavior by appellees." At 334. In particular, according to the majority, the evidence suggests that

> *upon occasion* certain appellees used the same labor rate in writing estimates, that they had similar arrangements with repair shops that agreed to do volume work at the low rates used in their estimates, that they conducted surveys of repair shops to determine the average rate charged by shops in particular areas, and that they tended to resist price increases by repair shops. * * *

*Id.* at 334–335 (emphasis in original).

Therefore, as the majority itself recognizes, the crucial question in this case is

---

**23.** *See* brief for appellants at 10 (statement of argument).

whether these parallel activities were undertaken pursuant to agreement or whether they were undertaken independently in the "economic self-interest of each of the individual appellees." *Id.* at 335. Indisputably, this issue involves "motive and intent" since it goes to the reason why insurance companies acted as they did. The case is thus in the grip of *Poller*, and summary disposition is ill-advised.

The inappropriateness of summary judgment is magnified by the fact that the District Court chose not to discuss the state of the record, even though motion papers before the court had dealt with the existence of the horizontal agreement. Instead, we deal here with a more egregious practice: summary disposition by a Court of Appeals based on its own review of several volumes of lifeless record. Appellate courts are hardly well-suited to this task.

As for the record itself, the majority would grant summary judgment because it finds no evidence that supports or creates an inference of a conspiracy or agreement. At 327. However, the record is hardly devoid of genuine factual issues. For example, the record amply demonstrates that one of the appellees visited several other major insurance companies on more than one occasion and discussed in extensive detail their procedures for handling automobile damage claims, including use of back-up and preferred garages. *See* II Appendix for Appellants (App.) 282A–374A (Liberty Mutual memoranda). Other meetings among appellees on the subject of the costs of automobile damage repair also took place. *See, e.g.,* Record, Vol. 9, Entry No. 235, Exhibit C. Moreover, one of the appellees (Travelers) opened up an experimental body repair shop in order to determine repair costs more accurately, and another appellee (Nationwide) subsequently secured data from Travelers about the hourly rate at which a profit could be made. *Id.,* Exhibit B. The record also shows attempts by one company to induce collective action to resist an increase in the labor rate in one market. *See* App. 126A (State Farm document stating that no other insurers "would join us to this extent"). Similarly, a Liber-

ty Mutual memorandum to its claims personnel instructed them to "check with competitors, as some of our offices have done," if they had concerns about the number of back-up garages which would do work at given rates. App. 378A. Moreover, a survey of auto repair labor rates conducted by one company shows a surprising uniformity across several major markets. *See* Record, Vol. 9, Entry No. 235, Exhibit E (showing same hourly rate in Boston, Charlotte, Chicago, Dallas, New Haven, New Orleans, Philadelphia, San Diego, and Syracuse). These facts, and others spread throughout the record, create an inference of agreement among the insurers, especially when combined with the clear evidence of parallel behavior. The existence of a conspiracy is surely a matter of dispute for a jury to resolve.

The majority questions the significance of such evidence, *e.g.,* at 329–330 n.46, and it refuses to infer any agreement despite evidence of contacts and parallel behavior, *id.* at 45. However, "if the evidence presented on the motion is subject to conflicting interpretations, or reasonable men might differ as to its significance, summary judgment is improper." 10 C. Wright & A. Miller, *supra,* § 2725 at 515 (footnotes omitted). *See, e.g., United States v. Perry,* 431 F.2d 1020, 1022 (9th Cir. 1970) ("Summary judgment should not be granted where contradictory inferences may be drawn from undisputed evidentiary facts."); *Chenette v. Trustees of Iowa College,* 431 F.2d 49, 53 (8th Cir. 1970) ("Evaluative judgment between two rationally possible conclusions from facts cannot be engaged in on summary judgment.").

## III. THE VERTICAL AGREEMENTS

The majority concedes that appellants have presented evidence to support the existence of vertical agreements between insurers and repair shops to do work at specified rates. *E.g.,* at 335. The majority also rejects the District Court's judgment that such agreements are the business of insurance. *Id.* at 336–337. The only

issue in dispute is whether such agreements are illegal. However, because of its holdings concerning the horizontal agreement, the majority offers "no opinion on whether the alleged vertical arrangements would be unlawful if they were used to implement an unlawful horizontal agreement * * *." *Id.* at 338.

Since I have rejected the majority's conclusions as to the legality and existence of the alleged horizontal agreement, I address the legality of a vertical agreement used to implement an illegal horizontal agreement. While vertical agreements are not illegal *per se*, they would be illegal if anticompetitive in purpose and effect. *See Nat'l Society of Professional Engineers v. United States*, 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978). Here, the vertical agreements were a necessary concomitance to the alleged price-fixing agreement. They advanced a horizontal agreement that was inherently anticompetitive and that was *per se* illegal. *See id.* Seen in this light, the vertical agreements themselves were necessarily anticompetitive. Accordingly, given the existence of the illegal horizontal agreement, a finding that the vertical agreements violated the law seems inescapable.

### IV. CONCLUSION

Ten years after filing their complaint, appellants are once again deprived of a trial on the merits. In order to achieve this result, the majority has in my judgment badly misconstrued the meaning of *Royal Drug* and of the legislative history of the McCarran Act exemption. Moreover, despite contrary guidance from the Supreme Court, it has summarily disposed of the case after examining the record even though the District Court was unwilling to do so. As a result, it fails to address the legality of vertical agreements which implement unlawful horizontal agreements.

For all of these reasons, I respectfully dissent.